**DAVID Z. CHESNOFF**
Nevada Bar No. 2292
**RICHARD A. SCHONFELD**
Nevada Bar No. 6815
**CHESNOFF & SCHONFELD**
**520 South Fourth Street**
**Las Vegas, Nevada 89101**
**(702) 384-5563**
**Attorneys for Plaintiff**
**William A. Richardson**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| **WILLIAM A. RICHARDSON,** ) | **Case No.  2:11-cv-02078-GMN (PAL)** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| ) | |
| **OPPENHEIMER & CO., Inc., a Delaware** ) | |
| **Corporation; OPPENHEIMER** ) | |
| **HOLDINGS INC., a Delaware Corporation;** ) | |
| **OPPENHEIMER ASSET MANAGEMENT,** ) | |
| **INC., a New York Corporation;** ) | |
| **MARK WEINBERG, an Individual;** ) | |
| **DOE DEFENDANTS 1 through 100;** ) | |
| **ROE CORPORATE DEFENDANTS 1 through** ) | |
| **100, inclusive.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## FIRST AMENDED COMPLAINT

Comes Now, Plaintiff William A. Richardson, by and through his counsel of record

David Z. Chesnoff, Esq., and Richard A. Schonfeld, Esq., of the law offices of Chesnoff &

Schonfeld, and files his First Amended Complaint against the above named Defendants alleging

as follows:

## PRELIMINARY STATEMENT

1.     This action arises out of Defendants' false and misleading statements to, and material omissions from, William A. Richardson ("Plaintiff" or "Mr. Richardson") aimed at inducing Mr. Richardson to purchase auction rate securities ("ARS") from the Oppenheimer & Company, Inc., Oppenheimer Holdings, Inc., and Oppenheimer Asset Management, Inc., collectively referred to as " Oppenheimer," and convincing Mr. Richardson to hold and to continue to purchase those securities at a time when the Defendants knew the market for those ARS was collapsing;

2.     ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions, typically held every 7, 14, 28, or 35 days.  ARS auctions are typically conducted by the same large financial institutions that provide the issuers of the ARS with underwriting services ("Lead Underwriters").  The auctions are intended to enable investors to easily liquidate their ARS at the end of each period.  Based on the short intervals between auctions, ARS pay interest rates or dividend yields consistent with lower, short-term rates, but typically higher than those paid by treasuries or money market instruments.  Both the Lead Underwriters and downstream brokers, including Oppenheimer, marketed ARS as advantageous to investors, representing that ARS were as safe and liquid as money market instruments, but with a slightly higher yield to compensate for the time intervals or "holding periods" between auction;

3.     On or about August 30, 2004[1], William A. Richardson entered into a Customer Agreement with Oppenheimer & Co., Inc., and he opened Account Number *****85 at office G-58 in the State of Nevada.  Mr. Richardson's Financial Advisor was Mark W. Weinberg (RH4);

---

[1]While the contract is dated August 30, 2004, there are account records that date back to 2002.

4.      Starting in December of 2002, upon the advice of Mark Weinberg and Oppenheimer Defendants along with the representations from Oppenheimer and its agent Mark Weinberg that ARS were as liquid and secure as cash, Mark Weinberg on Mr. Richardson's behalf started purchasing ARS. Mr. Richardson often utilized the ARS as a short term holding and frequently held the ARS for less than twelve months[2]. Mark Weinberg had discretion to make purchases on Mr. Richardson's behalf consistent with Mr. Richardson's direction that he desired safe, liquid investments;

5.      Mr. Richardson told Mr. Weinberg that he needed to have immediate access to his funds at all times and Mr. Weinberg advised Mr. Richardson that the ARS were better than a money market account. Mr. Weinberg advised Mr. Richardson that he would be able to access his funds when needed;

6.      Mr. Richardson was unfamiliar with ARS and had not considered investing in those securities prior to his conversations with Mr. Weinberg;

7.      Relying on Mr. Weinberg's advice and recommendation that ARS were better than a money market account and that he would be able to access his funds when needed, and because Mr. Weinberg did not disclose material facts concerning ARS and the auction market, Mr. Richardson authorized Mr. Weinberg to purchase ARS for Mr. Richardson's account;

8.      Mr. Richardson relied upon Mr. Weinberg to select the ARS to be purchased;

9.      Neither Mr. Weinberg nor any other Oppenheimer employee provided Mr. Richardson with any written or verbal description of Oppenheimer's ARS practices and procedures or any

---

[2]Some of the ARS were held for longer periods of time; however, they were always held based upon the representation that they were a cash equivalent and were liquid.

written material concerning the ARS before or at the time of Mr. Richardson's purchases of those securities[3];

10.    Neither Mr. Weinberg nor any other Oppenheimer employee at any time prior to February 14, 2008, explained to Mr. Richardson 1) how ARS were traded or priced, or 2) that financial firms like Oppenheimer could influence interest rates by bidding in the auctions;

11.    Neither Mr. Weinberg nor any other Oppenheimer employee at any time prior to February 14, 2008, described to Mr. Richardson 1) the risk of auction failures, 2) the extent to which the ARS market was being supported by auction dealers; or 3) the deteriorating condition of the auction rate securities market;

12.    Had Mr. Richardson known the information in paragraphs 130 through 132 below, he would not have purchased ARS from Oppenheimer;

13.    Mr. Richardson continues to hold illiquid ARS purchased from Oppenheimer;

In February of 2008, when the market failed Mr. Richardson was holding the following ARS as represented in his Oppenheimer Statement of Account under "Cash Equivalents":

| | | |
|---|---|---|
| 1. | Blackrock Insd Mun Income TR Mon: | $1,825,000; |
| 2. | Blackrock Insd Mun Income TR Thu: | $2,250,000; |
| 3. | Blackrock Insd Mun Income TR Fri: | $2,350,000; |
| 4. | Eaton Vance Ins Mun Bd FD Mon: | $1,575,000; |
| 5. | Eaton Vance Ins Mun BD FD Tue: | $3,100,000; |
| 6. | Eaton Vance Ins Mun BD Wed: | $1,525,000; |

---

[3]Mr. Richardson's purchases refers to the ARS that Mr. Weinberg purchased in Mr. Richardson's account.

4

| | | |
|---|---|---|
| 7. | Eaton Vance Ins Mun BD Thu: | $1,325,000; |
| 8. | Eaton Vance Ins Mun BD Fri: | $5,275,000; |
| 9. | Federated Prem Intr Mun Inc FD: | $3,000,000; |
| 10. | Nuveen Tax Free Adv Mun FD Tue: | $2,950,000; |
| 11. | Pimco Municipal Income FD Mon: | $3,000,000; |
| 12. | Pimco Municipal Income FD Wed: | $2,625,000; |
| 13. | Pimco Municipal Income FD Thu: | $2,775,000; |
| 14. | Pimco Municipal Income FD II Mon: | $2,050,000; |
| 15. | Pimco Mun Income FD II Tues: | $3,000,000; |
| 16. | Pimco Mun Income FD II Wed: | $2,950,000; |
| 17. | Pimco Mun Income Fd II Thu: | $3,375,000; |
| 18. | Pimco Mun Income FD II Fri: | $3,550,000; |
| Total ARS holdings as of February 2008: | | $48,500,000; |

The Current ARS Holdings and value as represented in the Oppenheimer Statement of Account (although the ARS Market Collapsed, some companies have "redeemed" ARS individually or through settlements) under the post February 14 heading "Other Securities" are:

| | | |
|---|---|---|
| 1. | Pimco Municipal Income FD Mon: | $2,975,000; |
| 2. | Pimco Municipal Income FD Wed: | $2,500,000; |
| 3. | Pimco Municipal Income FD Thu: | $2,625,000; |
| 4. | Pimco Municipal Income FD II Mon: | $1,600,000; |
| 5. | Pimco Mun Income FD II Tues: | $2,325,000; |
| 6. | Pimco Mun Income FD II Wed: | $2,375,000; |

7.    Pimco Mun Income Fd II Thu:                  $2,600,000;

8.    Pimco Mun Income FD II Fri:                   $2,800,000[4];

Total ARS remaining:                                  $19,800,000

14.    In the 5 days prior to February 13, 2008, and the total collapse of the ARS market,

Mark Weinberg and Oppenheimer purchased over $6,900,000 of ARS in Plaintiff Richardson's

Oppenheimer account, at the same time that Oppenheimer and its executives were selling their

ARS holdings while in possession of knowledge that they did not disclose to Mr. Richardson that

the ARS market was failing;

15.    All of the Richardson ARS purchases were made as a result of the inducement by

Oppenheimer and Weinberg that the ARS were safe, liquid, and were a cash equivalent;

16.    Oppenheimer did not disclose to Mr. Richardson Oppenheimer's substantial financial

interest in selling Oppenheimer-brokered ARS rather than *bona fide* cash management

investments;

17.    Further, Oppenheimer did not disclose to Mr. Richardson that, contrary to Oppenheimer's

---

[4]The Pimco funds were purchased in 2007 or later are as follows: Pimco Municipal Fd Wed $400,000 purchased on July 18, 2007; Pimco Municipal Fd Tue $425,000 purchased February 12, 2008; Pimco Municipal Fd Thu $425,000 purchased June 28, 2007; Pimco Municipal Fd II Tue $575,000 purchased May 1, 2007; Pimco Municipal Fd II Fri $575,000 purchased August 10, 2007; Pimco Municipal Fd II Thu $600,000 purchased July 12, 2007; Pimco Municipal Fd II Wed $625,000 purchased November 28, 2007; Pimco Municipal Fd II Wed $650,000 purchased September 26, 2007; Pimco Municipal Fd II Tue $1,000,000 purchased June 26, 2007; Pimco Municipal Fd II Wed $1,100,000 purchased October 3, 2007; Pimco Municipal Fd II Mon $1,600,000 purchased October 5, 2007; Pimco Municipal Fd Mon $1,675,000 purchased February 11, 2008; Pimco Municipal Fd II Fri $1,750,000 purchased September 28, 2007; Pimco Municipal Fd II Thu $2,000,000 purchased September 27, 2007; Pimco Municipal Fd Wed $2,000,000 purchased October 3, 2007; Pimco Municipal Fd Thu $2,000,000 purchased September 27, 2007; Pimco Municipal Fd Thu $200,000 purchased January 18, 2007; Pimco Municipal Fd II Tue $325,000 purchased April 10, 2007; Pimco Municipal Fd II Fri $475,000 purchased January 26, 2007;

representations and even though Oppenheimer, its agents and employees, Albert Lowenthal, Robert Lowenthal, Greg White, Mark Weinberg and others knew the same, the Lead Underwriters' substantial and continuing purchases of Oppenheimer-brokered ARS for their own inventory were not rare or hypothetical occurrences, but rather were nearly daily necessities required to maintain liquidity in the ARS market due to a lack of sufficient third-party demand to provide genuine liquidity for those ARS. Oppenheimer knowingly failed to disclose to Mr. Richardson that these proprietary purchases of Oppenheimer-brokered ARS by the Lead Underwriters were restricted by internal inventory limits, or that the market for Oppenheimer-brokered ARS would collapse if and when the Lead Underwriters stopped buying the ARS;

18.     On or about February 13, 2008, the ARS market collapsed, primarily due to the Lead Underwriters' decision to cease placing proprietary bids sufficient to prevent auctions from failing. For more than six months prior to this collapse, all of the Defendants were well aware of significant problems in the ARS market, but failed to alert Mr. Richardson to these problems. Instead, even as Oppenheimer executives frantically sold their own personal ARS holdings, Oppenheimer continued to market ARS aggressively and purchase the ARS for Mr. Richardson, marketing the purported safety and liquidity of such securities;

19.     Oppenheimer and its executives sold their own ARS holdings to investors like Mr. Richardson and even to Mr. Richardson himself in February of 2008, at a time that they knew the market was collapsing and without disclosing to Mr. Richardson that the market was collapsing;

20.     In reliance upon Oppenheimer and Mark Weinberg's representations and omissions, Mr. Richardson purchased ARS from Oppenheimer up to and including purchases made as late as February 11, 2008. The collapse of the ARS market rendered those supposedly "safe" and

"liquid" securities illiquid, leaving Mr. Richardson holding approximately $19,800,000 in

illiquid Oppenheimer-brokered ARS as of the time of this First Amended Complaint;

## THE PARTIES

21.     William A. Richardson is a natural person and at all relevant times alleged in the

Complaint was a resident of the State of Nevada;

22.     Oppenheimer & Co., Inc., is incorporated in Delaware and has its principal office in New

York, New York.  Oppenheimer & Co., Inc., is registered with the Securities Exchange

Commission as a broker-dealer pursuant to Section 15(b) of the Securities Exchange Act of 1934

("The Exchange Act") and is a member of the New York Stock Exchange, the Financial Industry

Regulatory Authority ("FINRA"), and the Securities Investor Protection Corporation.

Oppenheimer & Co., Inc., is a wholly owned subsidiary of Oppenheimer Holdings, Inc.;

23.     Oppenheimer Holdings Inc., was a Canadian Corporation headquartered in Toronto,

Ontario.  In May of 2009, Oppenheimer Holdings Inc. rechartered as a Delaware corporation and

moved its headquarters to New York, New York.  Oppenheimer Holdings Inc. is a middle-market

investment bank and full-service investment dealer;

24.     Oppenheimer Asset Management Inc., is incorporated in New York and has its principal

offices in New York, New York.  Oppenheimer Asset Management Inc. is a registered

Investment Advisor pursuant to Section 203 of the Investment Advisor Act of 1940.

Oppenheimer Asset Management Inc., is a wholly owned subsidiary of Oppenheimer Holdings

Inc.;

25.     Unless specifically noted, "Oppenheimer" refers collectively to Defendants Oppenheimer

Holdings Inc., Oppenheimer & Co. Inc., and Oppenheimer Asset Management Inc.;

8

26.    Mark W. Weinberg is a natural person, and at all relevant times was a Financial Advisor working for Oppenheimer with advisor number RH4 and office number G-58. Mark W. Weinberg is a resident of the State of California;

## JURISDICTION AND VENUE

27.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1331, 1332, 1337, 1367. Certain claims asserted fall under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5);

28.    Oppenheimer, Weinberg, and all Defendants directly or indirectly used the mails and means and instrumentalities of interstate commerce in connection with the acts, practices, and courses of business alleged herein. Oppenheimer & Co., Inc., is registered with FINRA for operations in the State of Nevada and has been since 1983. Mark Weinberg was at all relevant times registered as a Financial Advisor for Oppenheimer & Co., Inc., with his office located in Las Vegas, Nevada;

29.    Venue is proper in this district pursuant to 15 U.S.C. §78aa because the Defendants transacted business in this district. Venue is also proper pursuant to Section 27 of the Exchange Act and 28 U.S.C. §§1391(b), 1337. Mr. Richardson resides in this District, Defendants transacted business in this District, and many of the acts that give rise to this Complaint occurred in this District;

30.    Mr. Richardson was at all times a resident of the State of Nevada, received his account statements through the United States Mail at an address in the State of Nevada, and the Defendants purposefully availed themselves to the State of Nevada. In connection with the acts

alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities

of interstate commerce including, but not limited to, the mails, interstate telephone

communications and the facilities of the national services markets;

## FACTS

### DESCRIPTION OF AUCTION RATE SECURITIES:

31.     Mr. Richardson repeats and re-alleges the allegations of paragraph 1 through 30 as though

fully set forth herein;

32.     ARS were first developed in 1984. By February of 2008, the ARS market had grown to

over $330 billion. During the time period relevant to this Complaint the ARS consisted

primarily of long term bonds issued by municipalities and student loan entities, as well as

preferred stock issued by closed-end funds, that have variable interest rates or dividend yields

periodically reset through auctions. They were used by issuers as an alternative variable rate

financing vehicle, and they were offered to Mr. Richardson as a highly liquid investment and an

alternative to money market funds;

33.     As a result of ARS being auctioned at par, the yield to the investor, and the cost of

financing for the issuer, between auction dates was determined by the interest rate or "clearing

rate", established through the periodic auctions, which were typically held every seven, fourteen,

twenty-eight, or thirty-five days. In these auctions, buy bids with the lowest interest rate, and

then successively higher rates, were accepted until all of the sell orders in that auction were

filled. The "clearing rate" was the lowest rate bid sufficient to cover all of the securities for sale

in the auction. If there were not enough bids to cover the securities in the auction, then the

auction failed and the issuer would pay a maximum or "penalty rate", which is either a flat rate or

10

a rate set based on a formula described in the offering documents. In the event of an auction

failure, all of the current holders would continue to hold the securities at the "penalty rate" until

the next successful auction, if any;

34.    The issuer of each auction rate security selected one or more broker-dealers to underwrite

the offering and/or manage the auction process. Investors could submit bids only through the

selected broker-dealers, and the issuer paid an annualized fee to each broker-dealer to manage the

auction process. The issuer also selected an auction agent to collect the bids and determine the

clearing rate for the auction;

35.    ARS auctions are typically conducted by the same large financial institutions that provide

the issuers of the ARS with underwriting services (the "Lead Underwriters"). The auctions are

intended to enable investors to easily liquidate their ARS at the end of each period. Based on the

short intervals between auctions, ARS pay interest rates or dividend yields consistent with lower,

short-term rates, but typically higher than those paid by treasuries or money market instruments.

Both the Lead Underwriters and downstream brokers, including Oppenheimer, marketed ARS as

advantageous to investors, representing that ARS were as safe and liquid as money market

instruments, but with a slightly higher yields to compensate for the time intervals or "holding

periods" between auctions;

36.    Issuers of ARS selected and paid firms to act as the dealer through which investors

submitted orders at auctions for the issuers' securities. The firm selected to receive bids was

referred to as an "auction dealer," "broker-dealer," or "auction manager" (hereinafter collectively

referred to as "auction manager"). Investors also could place orders at auctions through other

designated brokerages, often referred to as "remarketing agents" or "distributing firms" including

Oppenheimer, which would transmit those orders to the auction dealer. The firm that underwrote

an issuance of auction rate securities typically served as auction dealer for those securities;

37.     In the event that holders of ARS seeking to sell their securities at auction outnumbered

investors bidding for those instruments, the auction would be said to "fail." In the event of a

failed auction, none of the investors holding those ARS could sell their securities, and the

instruments would be illiquid until the next auction. During the holding period following a failed

auction, the ARS would pay investors a higher "penalty rate" or "fail rate" to penalize the issuers,

compensate investors for the temporary illiquidity, and create new liquidity by inducing new

investors to step in and purchase the ARS to benefit from the higher interest rate. "Fail rates"

varied for different ARS, and would be determined by the terms under which the particular

security had been issued;

38.     The Lead Underwriters, from whom Oppenheimer obtained the ARS that it brokered to

Mr. Richardson, had the option but absolutely no obligation to place proprietary bids in the

auctions they conducted. Often, however, the Lead Underwriters placed proprietary bids for

large numbers of ARS to ensure that the auctions did not fail;

**OPPENHEIMER IMPROPERLY MARKETED ARS TO MR. RICHARDSON AS A MONEY MARKET OR CASH EQUIVALENT:**

39.     Oppenheimer and Weinberg, failed to disclose to Mr. Richardson the true liquidity risks

associated with Oppenheimer-brokered ARS. Oppenheimer failed to disclose to Mr. Richardson

1) the frequency with which there were fewer bidders than sellers at ARS auctions including

auctions for Oppenheimer-brokered ARS; and 2) the degree to which Lead Underwriters were

required to purchase ARS, including Oppenheimer-brokered ARS, for their own inventories in

order to provide liquidity for these securities. Oppenheimer and its agents and employees knowingly concealed the fact that there was insufficient third party demand for Oppenheimer-brokered ARS to support the market for those securities and, accordingly, without the Lead Underwriters' substantial and continuing ability and/or willingness to purchase ARS, including Oppenheimer-brokered ARS, for their own inventories, those securities would become illiquid;

40.    Auction Rate Securities were extremely profitable for Oppenheimer and for the Oppenheimer financial advisors and brokers who sold the securities. Individual Oppenheimer financial advisors had a significant financial incentive to sell ARS, as they were compensated by Oppenheimer for each ARS sold. The commission for ARS were 2 to 3 times as much as treasuries. In order to perpetuate the auction market and sell as many ARS as possible, Oppenheimer represented to investors in its sales presentations by financial advisors, including Mark Weinberg, that ARS were the same as cash and were highly liquid, safe investments for short-term investment, and suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest. Mr. Richardson had advised Mr. Weinberg that he was looking for safe, liquid investments. Oppenheimer marketed the ARS to Mr. Richardson as an appropriate investment for those who wanted to have their money readily available;

41.    The following are material misrepresentations regarding ARS made by Weinberg and on behalf of the Oppenheimer Defendants, and made by Oppenheimer to Mr. Richardson from 2007 forward:

**MONTHLY STATEMENT OF ACCOUNTS:**

a.       On February 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of January 1, 2007 to January 31, 2007, that represented in the "Portfolio Summary" that

Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

b.       On March 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of February 1, 2007 to February 28, 2007, that represented in the "Portfolio Summary"

that Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

c.      On April 2, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of March 1, 2007 to March 31, 2007, that represented in the "Portfolio Summary" that Mr.

Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined

the individual ARS holdings in Mr. Richardson's account and represented said holdings under

the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

d.      On May 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of April 1, 2007 to April 30, 2007, that represented in the "Portfolio Summary" that Mr.

Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined

the individual ARS holdings in Mr. Richardson's account and represented said holdings under

the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

e.      On June 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of May 1, 2007 to May 31, 2007, that represented in the "Portfolio Summary" that Mr.

Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined

the individual ARS holdings in Mr. Richardson's account and represented said holdings under

the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

16

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

f.      On July 2, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of June 1, 2007 to June 30, 2007, that represented in the "Portfolio Summary" that Mr.

Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined

the individual ARS holdings in Mr. Richardson's account and represented said holdings under

the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

g.      On August 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

17

period of July 1, 2007 to July 31, 2007, that represented in the "Portfolio Summary" that Mr.

Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined

the individual ARS holdings in Mr. Richardson's account and represented said holdings under

the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

h.      On September 3, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of August 1, 2007 to August 31, 2007, that represented in the "Portfolio Summary" that

Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

18

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

i.      On October 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of September 1, 2007 to September 30, 2007, that represented in the "Portfolio Summary"

that Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

j.      On November 1, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of October 1, 2007 to October 31, 2007, that represented in the "Portfolio Summary" that

Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

k.        On December 3, 2007, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of November 1, 2007 to November 30, 2007, that represented in the "Portfolio Summary"

that Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further

outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings

under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City, Nevada, and relied upon the representations therein;

l.      On January 2, 2008, Oppenheimer caused to be mailed via United States Postal Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the period of December 1, 2007 to December 31, 2007, that represented in the "Portfolio Summary" that Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings under the account type as "CASH". That written statement further represented a calculation after describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS transactions for that period were "Cash Activity". The written statement reflected the name OPPENHEIMER on the upper left hand corner of the first page and further reflected the name Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The written statement further represented that Mark W. Weinberg was the financial Advisor servicing Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City, Nevada, and relied upon the representations therein;

m.      On February 1, 2008, Oppenheimer caused to be mailed via United States Postal Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the period of January 1, 2008 to January 31, 2008, that represented in the "Portfolio Summary" that Mr. Richardson's ARS holdings were "Cash Equivalents". That written statement further outlined the individual ARS holdings in Mr. Richardson's account and represented said holdings under the account type as "CASH". That written statement further represented a calculation after

describing Mr. Richardson's ARS holdings representing the cumulative amount of said holdings

as "TOTAL CASH EQUIVALENTS". That written statement further represented that the ARS

transactions for that period were "Cash Activity". The written statement reflected the name

OPPENHEIMER on the upper left hand corner of the first page and further reflected the name

Oppenheimer & Co., Inc., with an address of 125 Broad Street, New York, NY 10004. The

written statement further represented that Mark W. Weinberg was the financial Advisor servicing

Mr. Richardson's account. Mr. Richardson received the Statement of Account in Boulder City,

Nevada, and relied upon the representations therein;

n.       On March 3, 2008, Oppenheimer caused to be mailed via United States Postal

Service to Plaintiff Richardson located in Boulder City, Nevada, a Statement of Account for the

period of February 1, 2008 to February 29, 2008. This statement, after the complete collapse and

freezing of the ARS market, categorized the ARS as "Other Securities". This statement for the

first time referred to the total ARS holdings as "TOTAL OTHER SECURITIES" instead of

"TOTAL CASH EQUIVALENT" on all of the previously referenced written statements.

Weinberg and Oppenheimer purchased over $6,900,000 in ARS in Mr. Richardson's account in

the five days prior to the market collapse of February 13, 2008. Those ARS transactions were the

largest transactions in ARS over any single monthly period in Mr. Richardson's account history.

**TELEPHONE CONTACT:**

a.       On January 29, 2007, at 7:28am while in Clark County, Nevada, Plaintiff

Richardson received a telephone call from Mark Weinberg of Oppenheimer that lasted 7 minutes

in duration. During that telephone call Mr. Richardson and Mr. Weinberg discussed the potential

of Mr. Richardson investing some of his liquid assets in luxury real estate in Panama, as the

market in Panama was said to be "on fire". In order for Mr. Richardson to consider investing in

Panama he needed access to his funds. Accordingly, he re-confirmed with Mark Weinberg that

his ARS holdings were liquid and available to him as cash. Mr. Richardson also inquired if he

should convert some of his ARS holdings to treasuries. During that telephone call Mr. Weinberg

informed Mr. Richardson that ARS were the same as cash, were better than purchasing treasuries

as they had a higher interest and were just as secure, that the ARS were AAA rated, and that the

cash could be accessed at any time as it was "like a hundred dollar bill". Mr. Weinberg further

represented that the top advisors at Oppenheimer held ARS in their personal accounts. These

representations were made to Mr. Richardson with knowledge of Mr. Richardson's goal to have

liquidity in a safe manner. Mr. Richardson relied upon the representations;

b.      On February 15, 2007, at 9:49am while in Clark County, Nevada, Mr. Richardson

utilized the telephone and contacted Mr. Weinberg of Oppenheimer for a three minute telephone

call wherein Mr. Richardson and Mr. Weinberg discussed Mr. Richardson's account and

potential investments. During that call Mr. Weinberg referred to Mr. Richardson's ARS holdings

as "cash";

c.      On February 26, 2007, at 3:00pm while in Clark County, Nevada, Mr. Richardson

had a one minute telephone call with Mr. Weinberg. At no time during that call did Mr.

Weinberg change any of his prior representations regarding ARS;

d.      On February 28, 2007, while in Clark County, Nevada, at 7:43am, Mr. Richardson

contacted Mark Weinberg of Oppenheimer, and had an 8 minute telephonic conversation.

During the conversation Mr. Weinberg informed Mr. Richardson that ARS were the same as

cash, were better than purchasing treasuries as they had a higher interest and were just as secure,

that the ARS were AAA rated, and that the cash could be accessed at any time. These representations were made to Mr. Richardson with knowledge of Mr. Richardson's goal to have liquidity in a safe manner. Mr. Richardson relied upon those representations;

e.      On March 5, 2007, at 9:05am Mark Weinberg of Oppenheimer contacted Mr. Richardson who was in Clark County, Nevada, via telephone and had a one minute telephone conversation with Mr. Richardson. At no time during that call did Mr. Weinberg change any prior representations regarding ARS;

f.      On March 22, 2007, at 9:08am, while in Clark County, Nevada, Mr. Richardson contacted Mark Weinberg by telephone and had a one minute conversation with Mark Weinberg. At no time during that call did Mr. Weinberg change any of his prior representations regarding ARS;

g.      On March 28, 2007, at 9:03am Mark Weinberg contacted Mr. Richardson who was in Clark County, Nevada, and had a seven minute telephone conversation. During that telephone conversation Mr. Weinberg informed Mr. Richardson that ARS were the same as cash, were better than purchasing treasuries as they had a higher interest and were just as secure, that the ARS were AAA rated, and that the cash could be accessed at any time. These representations were made to Mr. Richardson with knowledge of Mr. Richardson's goal to have liquidity in a safe manner. Mr. Richardson relied upon those representations;

h.      On March 29, 2007, at 10:17am, Mark Weinberg contacted Mr. Richardson who was in San Francisco, California, and had a four minute telephone conversation. During that telephone conversation Mr. Weinberg did not change any of his prior representations regarding ARS;

24

i.      On April 10, 2007, at 11:05am, Mark Weinberg contacted Mr. Richardson who was

in Washington, D.C., and had a three minute telephone conversation.  During that conversation

Mr. Weinberg reasserted that ARS were the same as cash and were a liquid investment suitable

for Mr. Richardson's account objectives;

j.      On May 3, 2007, at 12:54pm, Mr. Weinberg contacted Mr. Richardson who was in

Clark County, Nevada, and had a 2 minute telephone conversation.  At no time during that

conversation did Mr. Weinberg change any of his prior representations regarding ARS;

k.      On May 30, 2007, at 12:44 through 12:48, Mr. Richardson who was in Clark

County, Nevada, communicated over the telephone with Mr. Weinberg regarding potential

investments.  At no point in that conversation did Mr. Weinberg change his prior representations

regarding ARS;

l.      On May 31, 2007, at 7:53am, Mr. Richardson who was in Clark County, Nevada,

contacted Mr. Weinberg via telephone and had a five minute conversation.  During that

conversation Mr. Richardson and Mr. Weinberg discussed the potential for Mr. Richardson to

invest funds in a non-ARS offering by Lehman Brothers Holdings, Inc.  In order for Mr.

Richardson to invest he would need liquid funds.  Accordingly, he inquired of Mr. Weinberg as

to his available funds at which time Mr. Weinberg informed Mr. Richardson that ARS were the

same as cash, were secure, were AAA rated, and that the "cash" could be accessed at any time.

Mr. Weinberg further represented that the top advisors at Oppenheimer held ARS in their

personal accounts.  These representations were made to Mr. Richardson with knowledge of Mr.

Richardson's goal to have liquidity in a safe manner.  Mr. Richardson relied upon those

representations;

m.      On June 13, 2007, at 8:21am, while in Clark County, Nevada, Mr. Richardson

contacted Mr. Weinberg via telephone and had a 3 minute conversation with Mr. Weinberg.

During that conversation Mr. Weinberg referred to Mr. Richardson's ARS holdings as "cash";

n.      On June 14, 2007, at 7:35am, while in Clark County, Nevada, Mr. Richardson

contacted Mark Weinberg via telephone and had a 2 minute conversation.  At no time during that

conversation did Mr. Weinberg change his prior representations regarding ARS.  Mr. Richardson

relied upon those representations;

o.      On June 19, 2007, at 8:43am, while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg and had a 2 minute conversation.  At no time

during that conversation did Mr. Weinberg change his prior representations regarding ARS;

p.      On June 19, 2007, at 9:43am, while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg and had a 3 minute conversation.  At no time

during that conversation did Mr. Weinberg change his prior representations regarding ARS;

q.      On June 20, 2007, at 7:05am, Mark Weinberg contacted Mr. Richardson, who was

in Clark County, Nevada, via telephone and had a 2 minute telephone conversation.  At no time

during that conversation did Mr. Weinberg change his prior representations regarding ARS;

r.      On June 27, 2007, at 7:30am, while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg and had a 4 minute conversation.  During that

conversation Mr. Richardson and Mr. Weinberg discussed Mr. Richardson's account progress for

the first half of 2007, and potential changes for the second half of 2007.  Mr. Weinberg re-stated

that ARS were the same as a $100 bill, were safe and were liquid.  He further stated that it was a

better method of maintaining "cash" than treasuries;

s.      On July 27, 2007, while in Clark County, Nevada, Mr. Richardson received a telephone call from Mark Weinberg that lasted 2 minutes. At no time during that conversation did Mr. Weinberg change his prior representations regarding ARS;

t.      On August 9, 2007, at 10:26am while in Clark County, Nevada, Mr. Richardson contacted Mark Weinberg by telephone and had a 3 minute conversation. At no time during that conversation did Mr. Weinberg change his prior representations regarding ARS;

u.      On August 14, 2007, at 9:35am, while in Clark County, Nevada, Mr. Richardson placed a telephone call to Mr. Weinberg. The call lasted 5 minutes. During the telephone call Mr. Weinberg and Mr. Richardson discussed the falling hedge fund market. In order to consider investing in any market, Mr. Richardson needed available funds. Mr. Weinberg represented that the ARS were in fact available funds to Mr. Richardson and were the same as cash to invest as Mr. Richardson desired. Mr. Richardson relied upon those representations;

v.      On August 15, 2007, at 12:40pm while in Las Vegas, Nevada, Mr. Richardson received a telephone call from Mark Weinberg. The call lasted 2 minutes. At no time during the conversation did Mark Weinberg change his prior representations regarding ARS;

w.      On August 16, 2007, at 12:40pm while in Las Vegas, Nevada, Mr. Richardson received a telephone call from Mark Weinberg. The call lasted 2 minutes. At no time during the conversation did Mark Weinberg change his prior representations regarding ARS;

x.      On August 22, 2007, while in Westwood California, Mr. Richardson received a telephone call from Mark Weinberg. The call lasted 9 minutes. During that conversation Mr. Richardson and Mr. Weinberg furthered their prior conversation regarding the Hedge Fund market's performance in August. During this conversation Mr. Weinberg re-stated that ARS

were available funds to Mr. Richardson and were the same as cash to invest as Mr. Richardson

desired.  Mr. Richardson relied upon those representations;

y.      On August 23, 2008, Mr. Richardson placed two calls to Mark Weinberg, while Mr.

Richardson was in Clark County, Nevada.   Each call lasted 4 minutes.  The calls occurred at

8:54am and 10:34am.  Mr. Richardson and Mr. Weinberg continued their discussions regarding

potential investments and placement of Mr. Richardson's funds.  At no time during those

conversations did Mr. Weinberg change his prior representations regarding ARS;

z.      On September 5, 2007, Mr. Richardson received two calls from Mark Weinberg

while Mr. Richardson was in Clark County, Nevada.  The first call at 7:29am  lasted five minutes

and the second call at 9:09am lasted 4 minutes.  At no time during either conversation did Mr.

Weinberg change his prior representations regarding ARS;

aa.     On September 7, 2007, at 9:18am, while in Clark County, Nevada, Mr. Richardson

placed a telephone call to Mark Weinberg that lasted 2 minutes.  At no time during that

conversation did Mr. Weinberg change his prior representations regarding ARS;

bb.     On September 11, 2007, at 9:00am while in Clark County, Nevada, Mr. Richardson

placed a telephone call to Mr. Weinberg.  The call lasted 4 minutes.  At no time during that call

did Mr. Weinberg change his prior representations regarding ARS;

cc.     On September 12, 2007, at 7:36am while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg.  The call lasted 4 minutes.  At no time during

that call did Mr. Weinberg change his prior representations regarding ARS;

dd.     On September 17, 2007, at 7:34am while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg.  The call lasted 3 minutes.  At no time during

that call did Mr. Weinberg change his prior representations regarding ARS;

ee.     On September 20, 2007, at 7:15am while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg. The call lasted 3 minutes. During the

conversation Mr. Richardson and Mr. Weinberg discussed investments in gaming stocks. During

that conversation Mr. Weinberg referred to Mr. Richardson's ARS holdings as "cash" and stated

that they were available funds to invest if Mr. Richardson desired. At no time during that call did

Mr. Weinberg change his prior representations regarding ARS;

ff.     On September 27, 2007, at 10:40am while in Clark County, Nevada, Mr.

Richardson received a telephone call from Mark Weinberg. The call lasted 3 minutes. Mr.

Richardson and Mr. Weinberg continued their conversation regarding gaming stocks and

discussed Las Vegas Sands. At no time during that call did Mr. Weinberg change his prior

representations regarding ARS;

gg.     On October 3, 2007, at 8:12am while in Clark County, Nevada, Mr. Richardson

contacted Mark Weinberg by telephone. The call lasted 3 minutes. At no time during that call

did Mr. Weinberg change his prior representations regarding ARS;

hh.     On October 11, 2007, at 7:51am while in Clark County, Nevada, Mr. Richardson

placed a telephone call to Mark Weinberg that lasted 5 minutes. During that conversation Mr.

Richardson and Mr. Weinberg discussed an investment opportunity presented by a colleague of

Mr. Richardson. They also discussed a Reuters article regarding the Denny's restaurant

corporation. In order for Mr. Richardson to consider these types of investments he reiterated his

need to maintain safety, security, and liquidity to his funds. Mr. Weinberg stated that ARS were

the same as cash, were better than purchasing treasuries as they had a higher interest and were

just as secure, that the ARS were AAA rated, and that the cash could be accessed at any time as it

was "like a hundred dollar bill". Mr. Weinberg further stated that Oppenheimer executives

owned ARS in their personal holdings. These representations were made to Mr. Richardson with

knowledge of Mr. Richardson's goal to have liquidity in a safe manner. Mr. Richardson relied

upon those representations;

ii.     On October 15, 2007, at 10:38am, while in New York, New York, Mr. Richardson

placed a telephone call to Mark Weinberg that lasted 5 minutes. At no point during that

conversation did Mr. Weinberg change his prior representations regarding ARS;

jj.     On October 16, 2007, at 9:40am and again at 9:41am while in Clark County,

Nevada, Mr. Richardson attempted to reach Mark Weinberg by telephone. At 9:42am Mr.

Richardson was successful in reach Mr. Weinberg and they had a 6 minute telephone call. At no

time during that call did Mr. Weinberg change his prior representations regarding ARS;

kk.     On October 17, 2007, at 10:14am Mr. Richardson while in New Jersey, placed a

telephone call to Mr. Weinberg that lasted 2 minutes in duration. At no time during that

conversation did Mr. Weinberg change any of his previous representations regarding ARS;

ll.     On October 19, 2007, at 8:28am while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg. The call lasted 7 minutes. At no time during

that call did Mr. Weinberg change his prior representations regarding ARS;

mm.     On October 22, 2007, at 6:57am while in San Francisco, California, Mr. Richardson

placed a telephone call to Mark Weinberg that lasted 3 minutes in duration. At no time during

that conversation did Mr. Weinberg change his prior representations regarding ARS;

nn.     On October 25, 2007, at 7:19am while in Clark County, Nevada, Mr. Richardson

received a telephone call from Mark Weinberg. The call lasted 7 minutes. During that call Mr.

Richardson and Mr. Weinberg discussed a Petroleum investment. In order for Mr. Richardson to consider these types of investments he reiterated his need to maintain safety, security, and liquidity to his funds. Mr. Weinberg stated that ARS were the same as cash, were better than purchasing treasuries as they had a higher interest and were just as secure, that the ARS were AAA rated, and that the cash could be accessed at any time;

oo.    On October 29, 2007, at 7:49am while in Clark County, Nevada, Mr. Richardson placed a telephone call to Mr. Weinberg. The call lasted 4 minutes. At no time during that call did Mr. Weinberg change his prior representations regarding ARS;

pp.    On November 1, 2007, at 8:52am Mr. Richardson while in Clark County Nevada returned a telephone call from Mr. Weinberg. The call lasted 6 minutes. At no time during that call did Mr. Weinberg change his prior representations regarding ARS;

qq.    On November 15, 2007, at 10:51am, Mark Weinberg called Mr. Richardson who was in Clark County, Nevada, to discuss an expected distribution from a fund in which Mr. Richardson owned shares. Mr. Richardson and Mr. Weinberg discussed what to do with the funds, whether the funds should be reinvested or cashed out, and if cashed out how they would be held. At that time Mr. Weinberg represented that ARS were the same as cash, were better than purchasing treasuries as they had a higher interest and were just as secure, that the ARS were AAA rated, and that the cash could be accessed at any time;

rr.    On November 20, 2007, at 9:55am while in Clark County, Nevada, Mr. Richardson received a telephone call from Mr. Weinberg. The call lasted 4 minutes. Mr. Richardson and Mr. Weinberg continued to discuss the options regarding the distribution. At no time during that call did Mr. Weinberg change his prior representations regarding ARS;

ss.    On November 27, 2007, at while in Clark County, Nevada, Mr. Richardson received

a telephone call from Mark Weinberg. The call lasted 3 minutes. At no time during that call did

Mr. Weinberg change his prior representations regarding ARS;

tt.    On November 29, 2007, at 10:16am, while in New York, New York, Mr. Richardson

placed a telephone call to Mr. Weinberg that lasted 9 minutes. During that telephone call Mr.

Richardson and Mr. Weinberg discussed investments. Mr. Richardson and Mr. Weinberg

discussed that there were good investment opportunities for people with liquidity as there was a

lack of capital in the markets. They discussed distressed manufacturers in the United States, the

Taiwan stock exchange, and a Japanese bank as potential investment opportunities. As a result

of the potential opportunities in the market place Mr. Richardson re-expressed his need for

liquidity in his funds. Mr. Richardson suggested that some of his funds be placed in treasuries.

Mr. Weinberg informed Mr. Richardson that ARS were the same as cash, were better than

purchasing treasuries as they had a higher interest and were just as secure, that the ARS were

AAA rated, and that the cash could be accessed at any time. These representations were made to

Mr. Richardson with knowledge of Mr. Richardson's goal to have liquidity in a safe manner;

uu.    On December 7, 2007, while in Clark County, Nevada, Mr. Richardson placed a

telephone call to Mark Weinberg. The call lasted 2 minutes. At no time during that call did Mr.

Weinberg change his prior representations regarding ARS. Mr. Richardson relied upon those

representations;

vv.    On January 9, 2008, at 8:18am while in Clark County, Nevada, Mr. Richardson

placed a telephone call to Mark Weinberg. The call lasted 11 minutes. At no point in that call

did Mark Weinberg change his prior representations regarding ARS;

ww.    On January 16, 2008, at 8:35am, while in Clark County, Nevada, Mr. Richardson placed a telephone call to Mark Weinberg. The call lasted 5 minutes. At no point in that call did Mark Weinberg change his prior representations regarding ARS;

xx.    On January 23, 2008, at 7:33am, while in Clark County, Nevada, Mr. Richardson called Mark Weinberg and had a telephone conversation that lasted 7 minutes. During that conversation Mr. Richardson and Mr. Weinberg discussed Mr. Richardson's liquidity goals. Mr. Richardson and Mr. Weinberg discussed investment opportunities in the United States, Japan, and Taiwan, along with their belief that opportunities were available as a result of a lack of capital in the markets. Mr. Richardson re-expressed his need for liquidity in order to take advantage of the opportunities available. Mr. Weinberg re-stated that the ARS were the same as cash, were AAA rated, were better than treasuries, and that Mr. Richardson's "cash" could be easily accessed. Mr. Weinberg stated that Oppenheimer executives maintained ARS in their personal holdings.;

yy.    On January 31 at 7:54am while in Las Vegas, Nevada, Mr. Richardson contacted Mark Weinberg by telephone and had a 4 minute conversation. During that conversation Mr. Richardson and Mr. Weinberg discussed Mr. Richardson's investment objectives along with his desire to have liquidity. Mr. Weinberg advised Mr. Richardson that his ARS holdings were the same as cash and were accessible like cash;

zz.    On February 14, 2008, at 8:48am Mr. Weinberg and Mr. Richardson had an 11 minute telephone conversation while Mr. Richardson was in Los Angeles, California. It was during this telephone conversation that Mr. Weinberg informed Mr. Richardson that his ARS funds were frozen.

33

These representations are false, misleading, and omitted material facts as described in paragraphs 130 to 132 of this First Amended Complaint. Mr. Richardson relied upon all of the above representations.

42. The Financial Industry Regulatory Authority ("FINRA") is the largest independent regulator of securities firms in the United States. FINRA regulation 2310 required Defendants to make only suitable recommendations to Mr. Richardson related to ARS and other purchases in his Oppenheimer account. It is a FINRA suitability violation to make a recommendation to a client regarding the purchase of a security while failing to describe important facts and risks about the security to the client. The FINRA suitability requirements are triggered with each ARS purchase in Mr. Richardson's account;

43. Starting in 2003 and continuing thereafter, The National Association of Securities Dealers ("NASD"), which is now FINRA, issued guidance to its members (Defendant Oppenheimer & Co. Inc. was a member of both NASD and then FINRA from the inception of Mr. Richardson's account). The relevant guidance stated that prior to purchasing ARS for a customer or advising a customer to purchase ARS the brokerage firm and its associated person facilitating the transaction (in this case the Defendants) must conduct adequate due diligence to understand the features of the product, perform a reasonable basis suitability analysis, perform customer specific suitability analysis in connection with the transaction, and provide a balanced disclosure of both the risks and rewards associated with the particular product. Accordingly, each and every time Mark Weinberg purchased ARS in Mr. Richardson's account he and Oppenheimer had an obligation to disclose all material information regarding the ARS and the ARS market conditions. Defendants also had an obligation to perform a suitability analysis prior to each ARS

transaction. Mark Weinberg and Oppenheimer failed in those obligations as described in this First Amended Complaint;

44.    In addition to the FINRA requirement that Defendants disclose all material information, learn the market conditions, and disclose the market conditions to Mr. Richardson prior to each ARS transaction (which did not occur in the ARS transactions of Mr. Richardson) FINRA Rule 2111 required Defendants to seek and consider Mr. Richardson's financial situation and needs, investment objectives, liquidity needs (i.e. the customer's need to convert investments to cash without incurring significant loss in value), and risk tolerance, prior to each and every ARS transaction;

45.    Oppenheimer failed to disclose to purchasers, and to Mr. Richardson, the material facts about ARS. Oppenheimer failed to disclose that ARS were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Oppenheimer failed to disclose that the ARS it was selling were only liquid at the time of sale because broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. As detailed above, it was expressly represented to Mr. Richardson by Mark Weinberg of Oppenheimer that the ARS were as good as cash. Furthermore, the monthly Statement of Account, up until March of 2008, all reflected the ARS as cash. It was based upon those continued representations that Mark Weinberg had the authority to purchase ARS in Mr. Richardson' account;

46.    Not only did Mark Weinberg and Oppenheimer fail to acknowledge the significant financial market risks, but also failed to research what rates of return their clients would receive if the auctions failed. In failing to do so, they failed to evaluate what type of market might

develop for these products. Had they done the research and evaluated the potential market, they would have found that if auction failures occurred, investors would be holding long term bonds that paid low interest rates. These terms are so unattractive that there is no ready market and no incentive for an issuer to buy back the bond;

**ARS FAILURE:**

47.    In the summer of 2007, some auctions for ARS backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire ARS market. In the fall-winter of 2007, more auctions began to fail. However, Mark Weinberg and Oppenheimer continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets, were highly liquid, and were safe investments for short-term investing. Specific representations are outlined in paragraph 41 above. Oppenheimer failed to disclose the risks associated with the securities and continued to transact in ARS as a misrepresented "cash" in Mr. Richardson's account;

48.    On February 13, 2008, 87% of all auctions of ARS failed when Oppenheimer and other major broker-dealers refused to continue to support the auctions. As a result, the market for ARS collapsed and Mr. Richardson is left holding $19,800,000 in ARS with no means of liquidating those investments;

49.    In late January and early February of 2008, while Oppenheimer clients continued to be told by Oppenheimer, its agents and its financial advisors, including Weinberg, and still believed that they held cash like investments, Oppenheimer senior executives and ARS department personnel sold millions of dollars of their personal holdings of ARS in an effort to avoid the catastrophic effects of a market failure that they saw coming. In the 14 days of February prior to

the complete collapse and freezing of the ARS market, while Oppenheimer and its senior executives were selling their ARS holdings, Mark Weinberg and Oppenheimer purchased over $6,900,000 of ARS in Mr. Richardson's account. Those Oppenheimer executives did not inform Oppenheimer clients or Mr. Richardson of their concerns even though they were aware of the inevitable collapse of the ARS market[5]. Oppenheimer and its executives Albert Lowenthal, Greg White, Larry Spaulding, and Louis Gelormino hid the facts related to the market failures and imminent collapse from investors and Mr. Richardson in order to prop up and sustain the market while they unloaded their personal holdings;

50.    On January 18, 2008, the Managing Director of the Oppenheimer ARS Department, Greg White, emailed his top lieutenants and asked for a risk assessment. On the same day, Louis Gelormino, Senior Vice President, ARS Desk Supervisor responded with recognition that the ARS market could fail and they would not be able to sell shares. Oppenheimer received further warning about the fragility of the market and about the reality of auction failures and their implications when Lehman Brothers, Inc., chose not to support at least one of their auctions on January 23, 2008, causing the auction to fail. Other underwriters began failing auctions in the weeks following the Lehman failure. Even though Oppenheimer was aware of the dangers to the ARS market, Oppenheimer and all Defendants chose not to inform all clients of the failures or the likely dire consequences, and continued to purchase ARS in Mr. Richardson's account;

51.    Between January 30, 2007 and February 13, 2008, several Oppenheimer executives sold

---

[5]See Administrative Complaint filed by the Commonwealth of Massachusetts (Securities Division) v. Oppenheimer, Albert and Robert Lowenthal, and Greg White, case number 2008-0080. Oppenheimer settled this case with the Massachusetts regulators whereby clients would be repaid and/or given liquidity options for their ARS. Oppenheimer also settled with the New York Attorney General whereby they agreed to pay back $31,000,000 to investors.

their personal, family and trust account ARS holdings;

52.     These executives sold most of their ARS holdings following the initial auction failures in

August 2007, and increased their sales in the final two months before the market failure;

53.     At the time they sold their securities, these executives had knowledge of undisclosed

material facts about the risks associated with ARS and the rapidly deteriorating condition of the

ARS market;

54.     Albert Lowenthal sold $2,775,000 of ARS between December 17, 2007 and February 6,

2008;

55.     Greg White sold $5,225,000 of ARS between January 13, 2007 and February 13, 2008;

56.     Larry Spaulding, Executive Vice President and COO of Oppenheimer sold $700,000 of

ARS between February 8, 2008 and February 12, 2008;

57.     Louis Gelormino, the Desk Supervisor of the ARS Department sold $75,000 of his ARS

holdings on February 12, 2008;

58.     While members of management were unloading their personal holdings in late 2007 to

early 2008, Oppenheimer and Weinberg continued to encourage investors to purchase ARS,

continued to represent to Mr. Richardson that ARS were a safe alternative to cash or money

market accounts as described herein above, and Mark Weinberg did in fact purchase ARS for Mr.

Richardson during this time;

59.     Notwithstanding the foregoing, Oppenheimer and Weinberg marketed the ARS to Mr.

Richardson as a cash equivalent investment appropriate for the same purpose as money markets

and certificates of deposits.  Oppenheimer and all other Defendants had no basis to make these

claims when in reality they did no research to support their representations, and there were

indications the ARS market was failing;

60.      Meanwhile, while Mr. Weinberg was purchasing ARS on Mr. Richardson's behalf,

Oppenheimer Chief Executive Officer Albert Lowenthal sold $1,775,000 of personal holdings of

ARS between January 29, 2008, and February 12, 2008.  Oppenheimer Chief Operating Officer,

Larry Spaulding, sold $700,000 of his ARS between February 7, 2008, and February 11, 2008[6].

Greg White, the Managing Director of the Oppenheimer ARS department sold $300,000 of his

personal ARS and $100,000 in his wife's account between January 29, 2008 and February 12,

2008.  Louis Gelormino, Oppenheimer ARS Desk Supervisor and Senior Vice President sold

$75,000 of his personal ARS holdings on February 11, 2008[7].  All of these sales occurred

without notifying customers, and specifically Mr. Richardson, of the liquidity problems with

ARS;

61.      On January 14, 2009, Albert Lowenthal wrote a letter to Mr. Richardson in which he

reaffirmed Oppenheimer's prior representations that ARS were a "bona fide investment for

investors to use as an alternative to money funds, commercial paper and other short term

securities for their idle cash."  That letter claims that Oppenheimer had no advance knowledge

that auctions were failing, notwithstanding Mr. Lowenthal's personal sale of his ARS prior to the

---

[6]Mr. Weinberg purchased on behalf of Mr. Richardson over $6,900,000 of ARS on or
after February 8, 2008 while Oppenheimer executives were selling their ARS based upon Mr.
Richardson providing Mr. Weinberg with the authority to purchase ARS as they were represented
to be the same as cash and readily available funds as described in Paragraph 41.  The ARS
purchases in February of 2008, represent the largest set of ARS purchases in one month (really
less than 6 days) in the entire history of Mr. Richardson's account.

[7]See Administrative Complaint filed by the Commonwealth of Massachusetts (Securities
Division) v. Oppenheimer, Albert and Robert Lowenthal, and Greg White, case number 2008-
0080.

market failures. In addition the letter claimed "While it has been disclosed that some of the underwriters of ARS had knowledge that auctions were failing or in jeopardy of failing, Oppenheimer, as a downstream firm, had no such advance knowledge." That statement was false and known to be false at the time it was made and was an effort by Oppenheimer and the other Defendants to continue the misrepresentations and omissions complained of herein;

62.    Unbeknownst to Mr. Richardson substantial disruptions and auction failures occurred in the market in the summer of 2007. Oppenheimer and the other Defendants intentionally choose not to inform all of its financial advisors or their clients of the failures. Even after Oppenheimer was placed on notice that auctions could fail Oppenheimer and the other Defendants intentionally disregarded that notice and continued to market the ARS to Mr. Richardson as a cash equivalent and as readily available funds, as described more fully in paragraph 41 of the First Amended Complaint. They further chose not to notify clients who had already made investments in ARS that they should believe anything other than what they had already been told about the safety and liquidity of the product. Mr. Weinberg had regular communication with Mr. Richardson up to and including February of 2008 and continued to make the representations contained herein that ARS were as safe as cash, were a cash equivalent, and were liquid. All of the marketing continued when in reality Oppenheimer had no basis to make the claims that ARS were a secure, easily accessible place for clients to invest their money;

63.    In mid-January 2008, Oppenheimer became aware that Lehman Brothers Inc., a major ARS lead underwriter was trying to exit the business. On January 18, 2008, the Managing Director of the Oppenheimer ARS Department Greg White emailed his top employees and asked for a risk assessment. On the same day, Louis Gelormino, Senior Vice President ARS Desk

Supervisor responded "If a sole participant processes its customer orders but declines entering a back bid, we may not be able to sell shares." Thus, Gelormino clearly identified and emphasized the possibility that lead underwriters may choose not to support the auction and also the result which would be auction failure;

64.     Oppenheimer received further warning about the fragility of the market and about the reality of auction failures and their implications when Lehman did in fact choose not so support at least one of its own auctions on January 23, 2008 causing the auction to fail;

65.     For years Oppenheimer had been telling Mr. Richardson that his funds were being held in a cash equivalent product that was available to be cashed out. However, by mid-January of 2008, Oppenheimer had internally discussed the distinct possibility that this might not end up being the case and market events indicated that the promised ready liquidity was in significant danger. Even though the firm was aware of the dangers to the ARS market, Oppenheimer, its agents, and the other Defendants knowingly chose not to inform Mr. Richardson of the failures or of the likely dire consequences, and instead purchased additional ARS with Mr. Richardson's funds;

66.     ARS were categorized as cash equivalents on Mr. Richardson's Oppenheimer account statements;

67.     Mr. Richardson is a conservative investor who held large portions of his investment portfolio in cash equivalent and low risk investments and he was advised by Oppenheimer and Weinberg that ARS were appropriate for his conservative investment objectives;

68.     Mr. Richardson was told by Oppenheimer and Weinberg that the ARS were as safe as a CD or money market account from his first purchase of ARS through his last purchases in February of 2008;

69.    Mr. Richardson was never told that an auction was involved when he wanted to obtain his

cash from the investment even though this fact was known by Oppenheimer, its agents, and the

other Defendants;

70.    Mr. Richardson was not told that a successful auction was required for the product to

maintain its seven to thirty five day liquidity even though this fact was known by Oppenheimer,

its agents, and the other Defendants;

71.    Mr. Richardson was not told that auctions that were required for the product to maintain

liquidity could fail even though this fact was known by Oppenheimer, its agents, and the other

Defendants;

72.    Mr. Richardson was not told that the reason why auctions had not failed in the past was

that the underwriters were continually submitting support bids and that these underwriters could

cease doing so at any time even though this fact was known by Oppenheimer, its agents, and the

other Defendants;

73.    Mr. Richardson was not told that if there was a failure, the products he was purchasing

were perpetual or long term in nature even though this fact was known by Oppenheimer, its

agents, and the other Defendants;

74.    Mr. Richardson was not told what rate of return he would receive in the event of an

auction failure even though this fact was known by Oppenheimer, its agents, and the other

Defendants;

75.    Oppenheimer and its agents, including Defendants Albert and Robert Lowenthal and

Greg White chose to classify ARS as non-securities so that they would not have to provide a

prospectus for this product.  As a result, Mr. Richardson received no written information on the

product and instead he relied solely upon the oral representations made by Mark Weinberg, Oppenheimer's agent;

**AUCTION DEALERS MANIPULATED THE MARKET FOR AUCTION RATE SECURITIES:**

76.    To mask the inherent lack of liquidity of ARS, auction dealers engaged in a wide range of tactics, while protecting themselves from the consequences of intervening in auctions to prevent failures;

77.    Throughout the period in which Mr. Richardson purchased ARS the major auction dealers used their own capital to place "support bids" in the auctions.  The placement of such support bids was done pursuant to a tacit understanding among market participants that the auction dealers would act to prevent auction failures;

78.    Through the placement of these support bids, auction dealers purchased ARS for their own account when the auction otherwise would have failed due to a lack of sufficient demand;

79.    Until August 2007, auction dealers followed uniform policies of placing support bids in auctions as necessary to prevent auction failures.  In August of 2007, some auction dealers stopped placing support bids in a limited number of auctions for securities that were backed by collateralized debt obligations and other risky investments, allowing those auctions to fail.  These securities represented a small fraction of the entire auction rate securities market, however, and the failures were not widely know to the investing public.  With the limited exception of these securities, auction dealers continued to intervene in the auctions to prevent failures until around February 13, 2008;

80.    For example, after January 1, 2006, auction dealer UBS placed support bids in more than

43

30,000 auctions of municipal and student loan auction rate securities, preventing more than 85

percent of those auctions from failing.  During the same time period, UBS placed support bids in

more than 27,000 auctions of auction rate preferred securities, preventing more than 50 percent

of those auctions from failing.  After January 3, 2006, auction dealer Merrill Lynch placed

support bids that prevented more than 5,800 auctions from failing.  During the relevant time

frame other major auction dealers, including Citigroup, Wachovia, Bank of America, and Royal

Bank of Canada, similarly placed support bids in all auctions for which they were the sole or lead

auction dealers as necessary to prevent the auctions from failing;

81.    The extensive and sustained interventions by auction dealers to prevent auction failures

created the outward appearance that auction rate securities were readily liquid investments;

82.    By intervening to prevent auction failures, auction dealers masked the liquidity risks

inherent in ARS.  Due to the lack of transparency in the auction market, investors had no way of

knowing the extent to which auction dealers' intervention were needed to sustain the auction rate

market and ensure that auctions continued to clear;

83.    Had auction dealers not supported these auctions, widespread auction failures would have

alerted the public to the risk characteristics of the auction rate securities;

84.    Throughout the time frame that Mr. Richardson purchased ARS, auction dealers set the

clearing rates for the auctions that would have failed but for their support bids.  For each auction,

auction dealers knew all the bids that had been placed by both holders and prospective buyers of

the securities.  Armed with that information, auction dealers placed buy bids at specified rates

and in sufficient amounts that ensured the auctions would clear at those rates;

85.     By intervening in the auctions, auction dealers set the clearing rates but also added auction rate securities to their own inventories.  Auction dealers and their distributing firms, including Oppenheimer, then reduced the excess inventory between auction periods by selling auction rate securities at the previously established clearing rates;

86.     Because purchasers of income securities such as bonds and preferred stocks consider higher interest rates to be an indicator of higher risk, interventions to manage interest rates and suppress auction failures deprived investors of objective information they needed to evaluate the true risk characteristics of auction rate securities;

**DEFENDANTS ACTED WITH THE INTENT TO DECEIVE INVESTORS:**

87.     Throughout the time frame that Mr. Richardson bought ARS, and specifically after they had knowledge of the troubled ARS market conditions as more fully described herein, Oppenheimer engaged in a deceptive scheme to sell auction rate securities to investors as highly liquid, cash equivalent instruments similar to money market funds or other cash management vehicles.  The scheme enabled Oppenheimer to reap millions of dollars in fees and sales commissions.  Oppenheimer, its agents, and the other Defendants knew, yet failed to disclose, that ARS were not liquid, cash-like investments; that the liquidity of those securities depended upon pervasive interventions by auction dealers; and that the auction rate securities market was under increasing strain during the relevant period of the Complaint, rendering it inevitable that the auction dealers would eventually withdraw their support for the auctions and the securities would become illiquid;

88.     Without notifying clients Oppenheimer underwrote tens of millions of dollars of auction rate securities, placing additional supply in an already saturated market.  To compensate

Oppenheimer for its underwriting services, issuers paid it as much as 55 basis points on the face value of the securities underwritten;

89.    Without notifying clients Oppenheimer also earned substantial fees from auction dealers for its services as a remarketing agent for ARS;

90.    Oppenheimer was motivated to make false or misleading omissions and statements of material fact about ARS in order to perpetuate its financial interests as a remarketing agent for those securities;

91.    The fees Oppenheimer received for remarketing auction rate securities were particularly attractive, as they allowed Oppenheimer to profit from its clients' short-term cash management investments.  These investments would ordinarily have been committed to other cash management vehicles such as money market funds, from which Oppenheimer would stand to earn little or no additional revenue;

92.    Oppenheimer offered financial incentives for its financial advisors to sell auction rate securities to their clients.  In addition, without notifying clients Oppenheimer paid significant additional compensation to financial advisors who sold new issuances of ARS, if their clients then held those securities for a "minimum" of two to four auction cycles;

93.    As Greg White wrote in an email dated July 11, 2007, these minimum holding periods and financial incentives associated with them were designed "to ensure that Oppenheimer continues to maintain and build positive long term relationships with the underwriters of these securities, continues to be shown these new issues, and receive[s] favorable allocations."  White further wrote that Oppenheimer would financially penalize financial advisors who allowed clients to "sell prior to the minimum holding period";

94.    The effect of Oppenheimer's policy of encouraging clients to hold ARS for multiple auction cycles was to limit the securities for sale at any given auction, thus masking the volatility in the auction market;

95.    The minimum-holding-period policy was implemented by Oppenheimer to promote its own interests (namely, its interest in the continuation of the propped-up auction rate market) over those of its investor clients (including their ability to liquidate their auction rate securities holdings at the first available opportunity);

**OPPENHEIMER KNEW OR RECKLESSLY DISREGARDED THE FACT THAT ARS LACKED SUFFICIENT MAXIMUM RATES TO ENSURE LIQUIDITY IN THE EVENT OF A FAILED AUCTION:**

96.    Like all other financial firms that sold ARS, Oppenheimer knew that retail investors would purchase auction rate securities only if they were highly rated by credit ratings agencies such as Fitch Ratings, Moody's Investor Services, and Standard & Poor's.  In fact, Oppenheimer touted AAA ratings as a selling point;

97.    As an underwriter of ARS during the period of time that ARS were purchased on Mr. Richardson's behalf by Mark Weinberg, Oppenheimer knew or recklessly disregarded the fact that ARS, including those that Oppenheimer underwrote, could obtain AAA ratings only if they carried low maximum rates, as the higher the maximum rate, the riskier the securities would be deemed by the agencies;

98.    Oppenheimer, its agents, and the other Defendants knew that during the period of time that Mr. Weinberg purchased ARS on Mr. Richardson's behalf, including the time period of 2007 forward, financial firms underwrote billions of dollars in auction rate securities with maximum rates that were insufficient to ensure the liquidity of those securities in the event of a

failed auction;

99.    Although the AAA ratings provided the appearance of quality and safety of principal,

Oppenheimer knew or recklessly disregarded the fact that those ratings actually reflected the low

maximum rates;

**OPPENHEIMER INFLUENCED THE ARS MARKET BY SERVING AS AN INTERMEDIARY BETWEEN AUCTION DEALERS AND OTHER DISTRIBUTING FIRMS:**

100.    During the period of time that Mr. Richardson purchased ARS, Oppenheimer played a

substantial role in the ARS market, serving as an intermediary between auction dealers and other

distributing firms, including Wells Fargo Investments, LLC ("Wells Fargo");

101.    Wells Fargo placed purchase and sale orders for ARS through Oppenheimer.  In

exchange, Oppenheimer paid a "trail commission" to Wells Fargo throughout the period of time

in which Wells Fargo clients held the auction rate securities they purchased;

102.    By serving in this intermediary role, Oppenheimer was privy to material, non-public

information about the functioning of the ARS market, including the inventory of auction rate

securities available for sale by the auction dealers;

103.    In addition, Oppenheimer provided "price talk" to Wells Fargo prior to the auctions.

"Price talk" refers to the guidance generally provided by an auction dealer or other significant

market participants to investors about the range of interest or dividend rates at which the auction

is expected to clear.  By controlling the "price talk" provided to Wells Fargo, Oppenheimer had

the ability to and did influence the clearing rates for those auctions;

**OPPENHEIMER KNEW OR RECKLESSLY DISREGARDED THE FACT THE ARS MARKET WAS DETERIORATING:**

104.    When auction dealers intervened to support otherwise failing auctions, they increased the amount of ARS in their proprietary accounts;

105.    As a result of the auction dealers' frequent interventions and consequent increases in their proprietary holdings, auction dealers were under consistent pressure to reduce their inventory of ARS. As a result, auction dealers pressured their brokers and distributing firms, including Oppenheimer, to sell these securities;

106.    Todd Flaman, a Senior Vice President and trader for Oppenheimer's ARS Department, has testified before the Massachusetts Securities Division that the ARS market experienced increased selling pressure in 2007 and 2008;

107.    Oppenheimer knew or acted with reckless disregard to the fact that the auction dealers' inventory of auction rate securities was increasing materially in 2007 and 2008. Personnel at Oppenheimer's ARS Department, including Greg White had access to computerized spreadsheets and databases detailing the auction dealers' inventory of auction rate securities. The information contained in these documents was material to ARS investors and not publicly available;

108.    The ARS sold by Oppenheimer included securities whose auctions were managed by Merill Lynch and UBS. The ARS inventory for each of those auction dealers increased dramatically during the relevant time frame. For instance, Merrill Lych's inventory expanded from less than $1 billion in August 2007, to $2.32 billion by mid-November 2007, to $3.1 billion by mid-December 2007. UBS's inventory of ARS increased from $2.5 billion in early September 2007, to $5 billion by late-December 2007 to $11 billion by February 2008. The

inventory for other auction managers similarly expanded during this time period;

109.    Oppenheimer executives monitored the auction dealers' inventory of ARS. For instance, in emails dated February 5, 2008, Grant Hewit, an Associate Vice President and trader for Oppenheimer's ARS Department, confirmed to White that inventory had increased substantially "street wide";

110.    Oppenheimer knew or recklessly disregarded the fact that these dramatic increases in inventory of auction dealers evidenced the deteriorating condition of the ARS market. The expanded inventories demonstrated that the level of support the auction dealers needed to provide to prevent auction failures was increasing, which created a materially greater risk the auction dealers would withdraw their support for the auctions and the securities would become illiquid;

**OPPENHEIMER MONITORED THE ARS MARKET AS IT COLLAPSED:**

111.    Starting in the summer of 2007 through early February 2008, as the credit market deteriorated, auction dealers, including Merrill Lynch, UBS, Lehman Brothers, and Deutsche Bank, chose not to intervene to prevent failures of auctions for certain ARS that were viewed by the credit markets as particularly undesirable;

112.    The only known prior failures in the 23 year history of the ARS market were isolated instances involving either insolvency of a single auction dealer or the credit downgrade of a single issuer. By contract, the auction failures that began in August of 2007 were the first failures in the history of the ARS market that occurred because auction dealers refused to continue to support the auction;

113.    Oppenheimer knew that the auction dealers had chosen not to support these auctions, because it had sold its investor clients Deutsche Bank-managed ARS for which the auctions failed. These securities became illiquid upon the auction failures in August of 2007;

114.    Oppenheimer knew or was reckless in not knowing that the auction failures that began in August 2007 were an indication that the continued liquidity of the ARS market depended on the support of auction dealers;

115.    Nevertheless, Oppenheimer withheld this information from Mr. Richardson and continued to aggressively market ARS and purchase ARS on Mr. Richardson's behalf. In fact, Albert Lowenthal instructed another executive not to inform Oppenheimer's financial advisors of the auction failures that began in August 2007;

116.    Lowenthal and other executives continued to monitor the ARS market. On a daily basis from August 2007 to the failed market, Lowenthal received a hand delivered Memorandum identifying auction failures;

117.    Greg White and other executives at Oppenheimer's ARS Department have testified before the Massachusetts Securities Division that Oppenheimer already knew in January of 2008 that auction dealers, including Lehman Brothers ("Lehman"), were contemplating exiting the ARS market;

118.    Oppenheimer knew or recklessly disregarded the fact that the continued viability of the entire ARS market depended upon concerted efforts by all auction dealers. If one auction dealer exited the market or permitted widespread auction failures, a "run on the bank" would ensue, with panic selling by investors, and all other auction dealers being forced to choose between attempting to sustain the ARS market by buying all securities offered at auction and allowing the

auctions to fail *en masse*;

119.    On January 18, 2008, approximately one month before the collapse of the ARS market, White sent Louis Gelormino the Desk Supervisor of the ARS Department and Senior Vice President at Oppenheimer, and ARS trader Todd Flaman an email asking them to "[t]hink about our ARS business and let me know your worst case thoughts on our potential counterparty risk." Gelormino responded with his conclusions that there were multiple scenarios that could occur in which Oppenheimer would "not be able to sell our [auction rate securities] positions.";

120.    Gelormino wrote in the same email that if "a sole participant processes it's [sic] customer orders but declines entering a back bid, we may not be able to sell shares." According to testimony before the Massachusetts Securities Division, White has acknowledged that he understood "back bid" to mean the support bid placed by an auction dealer to ensure that auctions would not fail;

121.    By January 23, 2008, Lehman allowed additional auctions to fail. White has testified before the Massachusetts Securities Division that he understood these failures to be "a shot across the bow," confirming that Lehman's intention to exit the ARS market. Following these failures, Lehman personnel told Flaman that the auctions had failed because there were more sellers than buyers in the ARS market;

122.    Days after the Lehman auction failures, auction dealer Piper Jaffray also allowed auctions to fail by refusing to place supporting bids. Oppenheimer was told by Piper Jaffray that these auctions failed because the maximum rates for the auction rate securities were insufficient to generate buyer interest. Piper Jaffray opted to let the auctions fail, rather than purchase securities for which the rates of return were capped;

123.    Around February 7, 2008, auction dealer Goldman Sachs allowed additional auctions to fail;

124.    The next day, auction rate securities trader Grant Hewit summed up his views about the condition of the ARS market, writing in an email to an acquaintance at Citigroup "I literally feel like the world is ending";

## OPPENHEIMER MISREPRESENTED AND OMITTED MATERIAL FACTS ABOUT THE ARS MARKET AND LIQUIDITY OF AND RISKS ASSOCIATED WITH ARS;

125.    Through the end of January 2009, even after several issuers had redeemed some of their illiquid auction rate securities, Oppenheimer estimated that its clients still held approximately $930 million worth of ARS in their Oppenheimer accounts;

126.    In a press release entitled "Oppenheimer Responds to MSD Complaint," issued on November 18, 2008, Oppenheimer admitted that it had sold ARS "as a cash management tool similar to a money market fund.";

127.    Oppenheimer's financial advisors contacted investors with significant cash holdings via unsolicited telephone calls and encouraged those investors to invest their cash in ARS;

128.    Oppenheimer directed financial advisors throughout the United States to represent to investors in its written materials and uniform sales presentations that ARS were equivalent to cash and were safe, highly liquid, short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.  Those representations were made orally to Mr. Richardson by Mark Weinberg as outlined in paragraph 41;

129.    ARS were not cash-like investments. Since at least March 2005, the "Big-4" accounting

firms, the Financial Accounting Standards Board ("FASB"), and the SEC have adopted the

position that ARS do not qualify as "cash equivalents." According to the SEC, "because the

auction rate securities have long-term maturity dates and there is no guarantee the holder will be

able to liquidate its holdings, these securities do not meet the definition of cash equivalents in

paragraphs 8 and 9 of FASB Statement No. 95, *Statement of Cash Flows.*";

130.    Nonetheless, Oppenheimer's financial advisors, including Weinberg, sold ARS as cash

equivalents to Mr. Richardson and others pursuant to management directives without disclosing,

either before or at the time of sale, the following material facts about these securities:

     a.    ARS were not cash alternatives, but were long-term financial instruments with
           maturity dates of 30 years of longer, or no maturity whatsoever;

     b.    With the exception of some ARS issued by state agencies, municipalities and
           other government authorities that had maximum rates high enough to attract
           liquidity or cause the issuer to refinance, ARS lacked features designed to ensure
           the holder's ability to sell the security, and in the event of an auction failure, the
           purchaser would be required to hold the security to maturity or indefinitely;

     c.    To obtain AAA credit ratings, which gave auction rate securities the appearance
           of quality and safety of principal, the maximum rates on those securities were
           capped at levels insufficient to attract liquidity or refinancing in the event of
           auction failures;

     d.    Auction rate securities appeared readily liquid at the time of purchase and sale
           because auction dealers were artificially supporting and manipulating the auction
           market to maintain the appearance of liquidity and stability;

     e.    The short-term nature of ARS and the ability of investors to liquidate their ARS at
           par depended on the perpetuation of the artificial auction market by auction
           dealers;

     f.    The periodic auctions at which the rates of interest or dividends on auction rate
           securities were set required that investors actively bid their securities to maximize
           the rate of return on their investments and minimize the impact of manipulative

conduct by the auction dealers and others, and in the absence of the investor's active participation in the time consuming and highly specialized process of monitoring "price talk" and the bidding process, investors were likely to earn interest or dividends at reduced rates; and;

g.    In the event of persistent auction failures, ARS would be saleable only at a substantial discount from their purchase price;

131.    Oppenheimer's financial advisors, including Weinberg, also sold ARS as cash equivalents pursuant to management directives without disclosing, either before or at the time of sale, the following material facts (which were known by Oppenheimer and the other Defendants) about the auction market in which those securities were traded:

a.    The auction market operated without transparency to investors, thus enabling manipulation by auction dealers;

b.    The "auctions" were not true Dutch auctions, as auction dealers submitted "support" bids and engaged in other manipulative practices for their own accounts in auctions that would have otherwise failed during the period of time that Mr. Richardson owned and/or purchased ARS, and did so with knowledge of the other bids in the auctions, and often did so after the bidding deadline imposed on other investors;

c.    Auction dealers routinely intervened in auctions during the time that Mr. Richardson owned and/or purchased ARS for their own benefit, to set rates and prevent all-hold auctions and failed auctions;

d.    Auction dealers directly or indirectly set the clearing rate in most of the auctions in which they submitted bids during the time that Mr. Richardson owned and/or purchased ARS;

e.    Auction dealers managed the interest rates for ARS to ensure that rates of interest or dividends paid were at levels sufficiently low to attract continued interest from their issuer clients in future ARS issuances, while paying sufficient interest to make ARS saleable to retail investors;

f.    By manipulating the auctions, auction dealers prevented investors from learning the true risk, value and liquidity features of ARS;

g.    Oppenheimer intended to continue to market ARS as cash equivalent and highly

55

liquid, safe investments, even after it determined that auction dealers were likely to stop supporting and manipulating the auctions;

h.   Purchasers of ARS were expected to monitor the auctions at all times to protect their interests, as auction dealers considered themselves free to "manage" auction outcomes and withdraw their support for the auctions at any time;

i.   Oppenheimer's policy of requiring investors to hold ARS for multiple auction cycles masked the volatility in the ARS market. Oppenheimer was motivated to hold ARS for investing clients to ensure its continued relationship with auction dealers and to ensure ARS market sustainability which was profitable to Oppenheimer;

j.   Beginning in 2007, the ARS market experienced increased turmoil, as exhibited by the auction dealers' expanding inventories and decisions to allow certain auctions to fail, which materially altered the risk that those securities would not trade as liquid investments;

k.   Auction dealers contemplated exiting the ARS market in the months before the market collapsed; and

l.   The withdrawal of support for the auctions by any single auction dealer would create a "run on the bank" and cause the ARS market to collapse;

132.   Oppenheimer's financial advisors, and Mark Weinberg, sold ARS as cash equivalents to Mr. Richardson pursuant to management directives without disclosing, either before or at the time of sale, the following material facts about the conflicts of interest between Oppenheimer's brokerage and investment banking operations with respect to ARS:

a.   Oppenheimer allowed the interests of its investment banking operations, which underwrote ARS in exchange for lucrative fees, to prevail over the obligations of fair dealing and full disclosure of its brokerage operations;

b.   Oppenheimer provided greater compensation to its financial advisors for selling products, including ARS, that supported the growth of Oppenheimer's investment banking operations than for selling other products; and

c.   To maintain its profitability, Oppenheimer underwrote ARS while knowing or recklessly disregarding the fact that the market for those securities was already

56

saturated, creating additional pressure on Oppenheimer's financial advisors to sell those securities;

133.    The omitted facts in paragraphs 130 to 132 were necessary to make Oppenheimer's descriptions of ARS as highly-liquid, cash-equivalent instruments not misleading;

134.    At all relevant times, Oppenheimer's financial advisors, and Mr. Weinberg, uniformly failed to disclose the information in paragraphs 130 to 132 above to investors and to Mr. Richardson, because they had not been provided with that information by Oppenheimer;

135.    At all relevant times, Oppenheimer failed to provide mandatory instruction or compliance training about ARS to its financial advisors and Mr. Weinberg.  Instead, Greg White, made periodic *ad hoc* presentations at Oppenheimer branch offices at which he described ARS as a cash management tool that provided better rates of return than other cash management instruments such as money market funds or certificates of deposit.  In general, White's presentations did not include a discussion of the maximum rates applicable to ARS, the auction dealers' practice of supporting the auction, the risk of auction failures, or the risk of illiquidity;

136.    As a result, Oppenheimer's financial advisors, and Mr. Weinberg, lacked even a rudimentary understanding about ARS and how the ARS market functioned during the relevant period;

137.    Oppenheimer's practice was not to deliver a prospectus to ARS purchasers, as it treated such purchases as "secondary market sales" exempt from prospectus delivery requirements;

138.    At all relevant times, Oppenheimer failed to disclose the liquidity characteristics of ARS or the risk of auction failure in its trade confirmations;

139.    At all relevant times Oppenheimer compounded and continued its misleading marketing

of ARS as readily liquid instruments by identifying those securities as "cash equivalents" on its

clients' account statements, including those statements sent to Mr. Richardson.  Mr. Richardson

received monthly statements through the United States mail addressed to Boulder City, Nevada,

in which the ARS were continuously listed as "Cash". See Paragraph 41.  From the first time that

Mark Weinberg purchased ARS in Mr. Richardson's account through February of 2008, Mr.

Richardson received monthly statements that listed ARS as cash in his account and each

statement constitutes a continued misrepresentation and/or omission of material fact.  Each

statement reflected that Mark Weinberg was the financial advisor for Mr. Richardson;

140.    It was only in February 2008, after the auction rate securities market had already

collapsed, that Oppenheimer stopped listing ARS as "cash equivalents" on account statements

and started classifying them instead as "other securities";

**NO SAFE HARBOR**:

141.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint;

142.    The statements pleaded herein were not identified as "forward-looking statements" when

made;

143.    To the extent that there were any forward-looking statements, there were no meaningful

cautionary statements identifying important factors that could cause actual results to differ

materially from those in the purportedly forward-looking statements;

144.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking

statements pleaded herein, Defendants are liable for those false forward-looking statements

because at the time each of those forward-looking statements was made, the particular speaker

knew or was grossly reckless in not knowing that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by a director or an executive officer of one or more Defendants who knew or was grossly reckless in not knowing that those statements were false when made;

**LOSS CAUSATION/ECONOMIC LOSS:**

145.    As alleged above, during the relevant period, Defendants engaged in a scheme and course of conduct to create, prop up, and perpetuate for their own benefit an artificial market for ARS and to inflate the perceived value of those securities to the detriment of Mr. Richardson;

146.    This scheme and course of conduct operated as a fraud or deceit on Mr. Richardson by, among other things, omitting to disclose material foreseeable risks concerning the market for auction rate securities and the value, safety, and liquidity risks of those investments;

147.    The materialization of the risks concealed by Defendants was foreseeable to Defendants during the relevant time frame;

148.    Those risks materialized when the major auction dealers refused to continue serving as buyers of last resort, causing most of the auctions to fail around February 13, 2008;

149.    Materialization of those risks and subsequent disclosures of those risks directly and/or proximately caused the damages sustained by Mr. Richardson;

150.    Only through the persistent conduct of auction dealers in artificially supporting, maintaining, and intervening in the auctions and acting as buyers of last resort was the market for auction rate securities able to exist;

151.    Defendants failed to disclose to Mr. Richardson that the ARS market depended on the voluntary, pervasive, and ongoing participation of the auction dealers in the auctions, and that the

ARS market was increasingly deteriorating;

152.    It was also materially deceptive for Defendants to represent to Mr. Richardson that ARS were cash equivalents or highly liquid investments, as further detailed in this First Amended Complaint and specifically in paragraph 41;

153.    When the auctions failed around February 13, 2008, the concealed risks that ARS would stop trading as cash equivalents materialized;

154.    Because of Defendants' failure to disclose these and other material risks, Mr. Richardson was damaged when auction dealers withdrew their support for the auction market;

155.    If not for Defendants' omissions and false or misleading statements of material fact about ARS, the auction market in which those securities were traded, and the conflicts of interest between Defendants' brokerage and investment banking operations with respect to ARS, Mr. Richardson would not have purchased ARS;

156.    Accordingly, Defendants' wrongdoing directly or proximately caused economic losses to Mr. Richardson by rendering his ARS illiquid, which precluded Mr. Richardson from selling those securities, and by limiting the interest and dividends that he would otherwise have received. Mr. Richardson continues to hold his ARS and receives interest and/or dividends on those securities at below-market rates that are insufficient to compensate for the lack of liquidity safeguards inherent in the securities;

157.    As a result of the materialization of the concealed risks, the true value and liquidity characteristics of ARS have been revealed. ARS remain illiquid, cannot be sold at par value on the open market, and are not worth the price Mr. Richardson paid for them;

158.    In its annual report to the SEC filed on Form 10-K for the fiscal year ended December 31,

2008, Oppenheimer Holdings stated that:

> The Company holds Auction Rate Preferred Securities ("ARPS") issued by
> closed-end funds...ARPS have historically been categorized as Level 1 in the fair
> value hierarchy...Once the auctions failed, the ARPS could no longer be valued
> using observable prices set in the auctions.   As a result, the Company has resorted
> to less observable determinants of the fair value of ARPS...The failure of auctions
> has resulted in a Level 3 categorization of ARPS in the fair value hierarchy.

Oppenheimer Holdings' reclassification of ARS on its own books from Level 1 assets to Level 3

assets constitutes a recognition that the ARS Mr. Richardson purchased are worth less than par

value;

159.    A recently developed secondary market values illiquid ARS at steep discounts to par

value.  Investors who have sold their ARS on this secondary market have realized substantial

losses;

**TRANSACTION CAUSATION:**

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE:**

160.    To the extent required, a presumption of reliance is applicable here due to Oppenheimer's

use of standardized sales pitches that omitted, on a uniform basis, the material facts described in

paragraphs 130 to 132 regarding ARS and the auction market in which those securities were

traded;

161.    The facts described in paragraphs 130 to 132, which Oppenheimer failed to disclose,

along with the misrepresentations in paragraph 41, were material in that there is a substantial

likelihood the disclosure of these facts would have been viewed by a reasonable investor as

having significantly altered the total mix of information about auction rate securities made

available;

162.    Oppenheimer's financial advisors were required to and did use uniform, standardized, and materially similar sales pitches created and/or approved by Oppenheimer's senior management to market and sell ARS to Mr. Richardson. The sales pitch did not vary appreciably, if at all;

163.    In light of Defendants' knowledge that their sales force routinely represented to investors that ARS were safe, highly liquid investments with interest rates established by periodic auctions, it was materially misleading for Defendants to fail to correct the record and state expressly that ARS were, among other things, neither safe nor liquid investments, had interest rates managed by auction dealers, and traded in a propped-up market that was increasingly susceptible to collapse;

164.    Mr. Richardson would not have invested in ARS had Defendants' omissions of material fact not concealed the true nature of those securities and the auction market in which those securities were traded;

165.    Mr. Richardson's fraud-based claims stem primarily, if not exclusively, from these omissions of material fact for which reliance may be presumed;

166.    In the alternative, and to the extent required, a presumption of reliance is applicable here because the ARS market was well developed and efficient throughout the relevant time frame;

167.    The presumption of reliance, based on the fraud-on -the market- doctrine, is applicable here, because among other things:

a.    Defendants made false or misleading omissions and misrepresentations of fact concerning ARS during the relevant time frame;

b.    The omissions and misrepresentations were material in that there is a substantial likelihood the disclosure of these facts would have been viewed by a reasonable investor

as having significantly altered the total mix of available information about ARS;

c.    The omissions and misrepresentations alleged would tend to induce a reasonable investor to misjudge, among other things, the value of the securities at issue; and

d.    Mr. Richardson purchased ARS after Defendants made these omissions and misrepresentations, and did so without knowledge of the omitted and misrepresented facts;

168.    Throughout the relevant time frame ARS were widely held among numerous classes of investors including individuals, small businesses, charities, and large corporate and institutional holders;

169.    The very designation "auction rate" securities implied that the securities were traded on an arm's-length basis, with the auctions matching buyers with sellers and establishing a clearing rate for periodic interest or dividend payments;

170.    ARS and the auction market had existed since 1984, and developed rapidly since that time;

171.    Throughout the relevant time frame and continuing until just days before the collapse of the ARS market, the major auction dealers published research reports and presentations that touted the longevity and durability of ARS;

172.    Throughout the relevant time frame, Oppenheimer and other financial firms sold auction rate securities as cash or money market equivalents without disclosing that the market for those securities was manipulated on a systematic and pervasive basis;

173.    Throughout the relevant time frame, the auction market digested current information regarding ARS and reflected that information in the prices of those securities;

63

174.    Material news concerning ARS had a prompt and immediate effect on the market price of

those securities, as evidenced by, among other things, the rapid decline in the market price

occurring after the collapse of the auction market in February 2008;

175.    Under these circumstances, all purchasers of ARS suffered similar injury in that those

securities were overvalued throughout the relevant time frame;

176.    When Mr. Richardson purchased ARS, he did not know about, and could not reasonably

have discovered, Defendants' wrongful conduct alleged in this Complaint;

177.    Mr. Richardson would not have purchased ARS from Defendants, or alternatively, would

not have purchased those securities on the terms on which they did, but for Defendants

misconduct;

### CAUSE OF ACTION NUMBER 1

### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT- AGAINST ALL DEFENDANTS EXCEPT OPPENHEIMER HOLDINGS INC., AND OPPENHEIMER ASSET MANAGEMENT INC.)

178.    Mr. Richardson repeats and re-alleges each and every allegation set forth in the

paragraphs above as if fully set forth herein;

179.    During the relevant time frame, the Defendants employed manipulative or deceptive

devices or contrivances, in contravention of Rule 10b-5(b) promulgated by the SEC, which was

intended to and, throughout the relevant time frame, did: 1) deceive the investing public,

including Mr. Richardson; 2) enable Oppenheimer to sell ARS to investors, and on which

Oppenheimer and its financial advisors made substantial fees and commissions; and 3) cause Mr.

Richardson to purchase overvalued ARS from Oppenheimer;

180.    The Defendants engaged in a scheme to defraud and made untrue statements of material

fact and/or omitted to state material facts necessary to make the statements made, in light of the

circumstances under which they were made, not misleading, in violation of Section 10(b) of the

Exchange ACT and Rule 10b-5(b);

181.    Oppenheimer & Co. Inc., and Mark Weinberg, are each sued as a primary participant in

the wrongful and illegal conduct charged herein;

182.    The Defendants, directly and indirectly, engaged and participated in a comprehensive

scheme to defraud and a continuous course of conduct to conceal adverse material information

about ARS as specified herein, including in particular the information specified in paragraphs

130 to 132;

183.    Defendants' deceptive conduct was furthered by the use, means, or instrumentalities of

interstate commerce and/or the mails, including but not limited to use of the wires and mails by

Oppenheimer and its personnel to transmit instructions for the purchase and sale of ARS and for

the dissemination of account statements that falsely identified ARS as "Cash Equivalents.";

184.    The information that Defendants failed to disclose to Mr. Richardson was material in

that there is a substantial likelihood the disclosure of the omitted information would have been

viewed by a reasonable investor as having significantly altered the total mix of information about

auction rate securities made available;

185.    Oppenheimer and its employees employed manipulative or deceptive devices or

contrivances, while in possession of material, adverse, non-public information, and engaged in

acts, practices, and a course of conduct as alleged herein in an effort to assure Mr. Richardson

that ARS were the same or virtually the same as cash and were highly liquid, safe, short-term

investment vehicles suitable for almost all investors;

186.    Oppenheimer and the other Defendants had actual knowledge of the misrepresentations and omissions of material fats set forth herein, or acted with deliberate disregard for the truth and gross recklessness in that it failed to ascertain and disclose such facts;

187.    Oppenheimer and the other Defendants made the material misrepresentations and/or omissions described herein knowingly or deliberately and for the purpose and effect of a) concealing the truth about the value, liquidity and risks of ARS and the condition of the ARS market from Mr. Richardson, and the investing public, and b) supporting the overvalued price and market for ARS;

188.    If Defendants did not have actual knowledge of the misrepresentations and omissions alleged herein, they were grossly reckless in failing to obtain such knowledge and refraining from taking those steps necessary to discover whether those statements were false or misleading;

189.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of ARS sold by Oppenheimer was artificially inflated during the relevant time frame;

190.    Not knowing that the market prices of ARS were artificially inflated, and relying directly or indirectly on the false or misleading statements or omissions of material fact made by Oppenheimer and the other Defendants, and/or on the absence of material information that was known to or deliberately disregarded by Oppenheimer and the other Defendants but not disclosed in public statements by Oppenheimer during the relevant time frame, and/or on the integrity of the auction market in which ARS traded, Mr. Richardson acquired overvalued ARS from Oppenheimer and was damaged thereby;

191.   At the time of said misrepresentations and omissions, Mr. Richardson was ignorant of their falsity and believed them to be true or was unaware that material information was being kept from him by Oppenheimer, its agents, and the other Defendants;

192.   Mr. Richardson acted with due diligence, did not act with recklessness, and could not have discovered the true facts that Oppenheimer and the other Defendants misstated and/or failed to disclose;

193.   Had Mr. Richardson and the marketplace known the truth regarding the value, liquidity, and risks of ARS, or the truth regarding the condition of the ARS market, which was not disclosed by Oppenheimer and the other Defendants, Mr. Richardson would not have purchased ARS from Oppenheimer, or, if he had acquired such securities during the relevant time frame, he would not have done so at the overvalued prices that he paid;

194.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereafter;

195.   As a direct and proximate result of Defendants' wrongful conduct, Mr. Richardson suffered damages in connection with his purchases of ARS from Oppenheimer;

## CAUSE OF ACTION NUMBER II

### (VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT-AGAINST OPPENHEIMER HOLDINGS INC., AND OPPENHEIMER ASSET MANAGEMENT INC.)

196.   Mr. Richardson repeats and re-alleges each and every allegation set forth in the paragraphs above as if fully set forth herein;

197.   Oppenheimer Holdings Inc., and Oppenheimer Asset Management Inc. acted as a controlling person of Oppenheimer within the meaning of Section 20(a) of the Exchange Act for

the reasons set forth in this Complaint;

198.     By virtue of its operational and management control of Oppenheimer & Co. Inc.,

including Oppenheimer Holdings Inc.'s 100% ownership of Oppenheimer & Co. Inc., and

systematic involvement in the fraudulent scheme alleged in this Complaint, Oppenheimer

Holdings Inc., and Oppenheimer Asset Management Inc. had the power to influence and control

and did influence and control, directly or indirectly, the decision making and actions of

Oppenheimer & Co. Inc., including the content and dissemination of the various statements and

omissions of material fact which Mr. Richardson contends were false or misleading;

199.     Oppenheimer Holdings Inc. And Oppenheimer Asset Management Inc. had the ability to

prevent the issuance of the statements and omissions of material facts described in this

Complaint;

200.     Oppenheimer Holdings Inc. And Oppenheimer Asset Management Inc. had direct and

supervisory involvement in the operations of Oppenheimer & Co. Inc., and therefore are

presumed to have had and exercised the power to control or influence the conduct giving rise to

the securities violations alleged in this Complaint;

201.     As set forth above, Oppenheimer & Co. Inc. violated Section 10(b) of the Exchange Act

and Rule 10b-5(b) promulgated thereunder by its acts and omissions as alleged in this Complaint;

202.     By virtue of their positions as controlling persons, Defendant Oppenheimer Holdings Inc.

and Oppenheimer Asset Management Inc. are liable pursuant to Section 20(a) of the Exchange

Act;

203.     As a direct and proximate result of Defendants' wrongful conduct, Mr. Richardson

suffered damages in connection with his purchase of ARS from Oppenheimer;

**Wherefore,** Plaintiff prays for relief and judgment as follows:

1. For an award of damages, including but not limited to rescission, other compensatory damages, consequential damages, restitution, and disgorgement of ill-gotten gains in favor of Plaintiff and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

2. For an award of attorneys fees and costs of suit;

3. An award of pre-judgment and post-judgment interest;

4. An award of extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

5. An award granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all those issues triable before a jury.

Dated this _20th_ day of June, 2013.

RESPECTFULLY SUBMITTED:


DAVID Z. CHESNOFF
Nevada Bar No. 2292
RICHARD A. SCHONFELD
Nevada Bar No. 6815
CHESNOFF & SCHONFELD
520 South Fourth Street
Las Vegas, Nevada 89101
(702) 384-5563
Attorneys for Plaintiff
William A. Richardson