# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM A. RICHARDSON,  )<br>  )<br>  Plaintiff,  )<br>  vs.  )<br>  )<br>OPPENHEIMER & CO. INC.; OPPENHEIMER  )<br>HOLDINGS INC.; OPPENHEIMER ASSET  )<br>MANAGEMENT, INC.; and MARK  )<br>WEINBERG; DOE DEFENDANTS 1 through  )<br>100; ROE CORPORATE DEFENDANTS 1  )<br>through 100, inclusive,  )<br>  )<br>  Defendants.  )<br>_____) | Case No.: 2:11-cv-02078-GMN-PAL<br><br>**ORDER** |

Before the Court are several related motions. First, Defendants Oppenheimer & Co. Inc., Oppenheimer Holdings Inc., Oppenheimer Asset Management, Inc., and Mark Weinberg (collectively "Defendants") move to dismiss Plaintiff's First Amended Complaint (the "Motion to Dismiss") (ECF No. 54). Second, as part of the Motion to Dismiss, Defendants request the Court take judicial notice of two exhibits attached to the Motion (the "Motion for Judicial Notice") (ECF No. 70). Third, Plaintiff William A. Richardson ("Plaintiff") moves to strike those exhibits (ECF No. 58) as improperly submitted on a motion to dismiss (the "Motion to Strike"). Finally, Plaintiff seeks the Court's permission to exceed the page limit in filing a response to Defendants' Motion to Dismiss (the "Motion to Exceed Page Limit") (ECF No. 55). For the reasons stated below, the Motion to Dismiss is granted in part and denied in part, the Motion for Judicial Notice is granted, the Motion to Strike is denied, and the Motion to Exceed Page Limit is denied as moot.

### I. BACKGROUND

This is a securities fraud case arising out of the systematic failure of the Auction Rate

Securities ("ARS") market in February 2008. ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions. (ECF No. 43, ¶ 2.) These periodic auctions provide high liquidity for the securities by enabling investors to easily sell their ARS holdings at regular intervals. (*Id.*) During an auction, potential purchasers bid by stating the minimum interest rate at which they are willing to purchase a quantity of ARS. (*Id.* at ¶ 33.) The bids are then sorted, high to low, and the lowest interest rate required to sell all available ARS—the "clearing rate"—becomes the rate that applies until the next auction. (*Id.*) Alternatively, if there are an insufficient number of bids to cover all the ARS offered for sale, the auction fails and the investors must retain their ARS until the next auction. (*Id.*)

Because of these periodic auctions, ARS were generally regarded as having the same liquidity as a money market fund but offering higher returns. (*Id.* at ¶ 2.) However, for many years, the success of the auctions was allegedly dependent on ARS underwriters purchasing large quantities of ARS at each auction to ensure that the auction did not fail (support bids), thus preserving the perceived liquidity of the security. (*Id.* at ¶ 17.) Beginning in 2007, the ARS underwriters allegedly began to withdraw their support bids and a few auctions—roughly 2-6%—began to fail. (*Id.* at ¶ 47.) This modest withdrawal of support, eventually culminated in a market-wide failure on February 13, 2008, when 87% of auctions failed. (*Id.* at ¶ 48.)

As early as 2002, Plaintiff William A. Richardson ("Plaintiff") began to invest in ARS on the advice of his financial advisor, Defendant Mark W. Weinberg ("Weinberg"), an employee of Defendant Oppenheimer & Co. Inc. ("Oppenheimer"). (*Id.* at ¶ 4.) Plaintiff informed Weinberg that he needed to have immediate access to his funds at all times and was consequently looking for a very liquid investment. (*Id.* at ¶ 5.) Presumably at this time, Weinberg informed Plaintiff about ARS and allegedly represented to Plaintiff that ARS were as liquid and secure as cash, were better than a certificate of deposit or money market account, and that Plaintiff would be able to access his funds when needed. (*Id.*) Plaintiff alleges that Weinberg continued to make

similar representations on telephone calls with Plaintiff from January 29, 2007 through January 31. (*Id.* at ¶ 41a-yy.)  Additionally, during this time-span, Oppenheimer sent monthly account statements to Plaintiff that listed his ARS holdings under the category "Cash Equivalents" (*Id.* at ¶ 41a-m.)  Relying on these statements, Plaintiff authorized Weinberg to purchase $6,900,000.00 worth of ARS in the early part of February 2008.

At the time these statements were made, Plaintiff alleges Oppenheimer knew of, or acted with deliberate indifference toward, the market's impending demise. (*Id.* at ¶ 186.)  Plaintiff alleges that Oppenheimer executives sent internal emails recognizing the market's reliance on underwriters' support bids and discussing what would happen in the event of a market failure. (*Id.* at ¶ 50.) Plaintiff also alleges that Oppenheimer executives tracked the inventory capacity and current holdings of underwriters using a computerized spreadsheet (*id.* at ¶ 107, 109) and monitored the auction failures happening across the market (*id.* at ¶ 116).  Oppenheimer executives allegedly made an affirmative decision to not inform Oppenheimer's financial advisors of the concerning trends developing in the ARS market. (*Id.* at ¶ 62.)  At the same time, Oppenheimer executives sold personal holdings of ARS in the days immediately preceding the market collapse. (*Id.* at ¶¶ 51-57.)

On February 14, 2008, after the market-wide failure, Weinberg allegedly called Plaintiff and informed him his ARS holdings were frozen. (*Id.* at ¶ 41zz.)  Additionally, Plaintiff's March 2008 account statement listed his ARS holdings under the category "Other Securities." (*Id.* at ¶ 41n.) Plaintiff alleges that his ARS holdings lost significant value because of the illiquidity resulting from the market collapse. (*Id.* at ¶ 159.)

Plaintiff filed this lawsuit against Defendants alleging violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), ("Section 10(b)") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, ("Rule 10b-5").  Plaintiff also alleges that Defendants Oppenheimer Holdings Inc. and Oppenheimer Asset Management, Inc.

are liable for Oppenheimer's Actions as control persons under § 20(a) of the Exchange Act, 15 U.S. C. § 78t(a) ("Section 20(a)").  The Court granted Defendants' first Motion to Dismiss because Plaintiff had not pled false statements with sufficient particularity to meet the heightened pleadings standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b). (ECF No. 40.)  Plaintiff filed his First Amended Complaint (the "FAC") on June 20, 2013, and Defendants again collectively moved to dismiss, arguing that the FAC also fails to plead facts with sufficient particularity to satisfy the heightened pleading standard under the PSLRA.

## II. DISCUSSION

### A. Motion for Leave to File Excess Pages

Initially, the Court must address the docketing issue of Plaintiff's Motion for Leave to File Excess Pages.  Plaintiff filed the Motion to Exceed Page Limit along with an eighty-one page document, which impermissibly combined Plaintiff's Response to the Motion to Dismiss with his Motion to Strike. (ECF Nos. 56, 57.) When required by the clerk's office to file the two documents separately, Plaintiff filed a second motion to exceed page limit (ECF No. 60) with the now-separated Response (ECF No. 59) and Motion to Strike (ECF No. 58).  The Court granted the second motion to exceed page limit, permitting up to forty-five pages (ECF No. 64), and Plaintiff filed a Corrected Response (ECF No. 67) in compliance with that Order.  However, the original Motion to Exceed Page Limit remained unresolved in the docket, as only the second motion was marked as addressed.  Thus, to clear the duplicative motion still pending, the Court denies Plaintiff's Motion for Leave to File Excess Pages as moot.

### B. Motion to Strike and Motion for Judicial Notice

Preliminary to analyzing the merits of the Motion to Dismiss, the Court must also address Plaintiff's Motion to Strike and Defendants' Motion for Judicial Notice.  Defendants attached the prospectuses of the ARS Plaintiff purchased, which were filed with the SEC, as exhibits to

the Motion to Dismiss. Defendants refer to these exhibits to support their argument that many of the omissions Plaintiff complains of were contained in publicly available information. Plaintiff seeks to strike the exhibits, arguing extrinsic evidence cannot be considered on a motion to dismiss. Defendants oppose Plaintiff's motion and request the Court take judicial notice of the documents so that they may be considered as part of the Motion to Dismiss.

As to Plaintiff's Motion to Strike, the Court notes that Fed. R. Civ. P. 12(f) provides authority for the Court to strike matters from *pleadings*. Fed. R. Civ. P. 7(a) identifies pleadings as the complaint, answer, and reply, but not motions and other papers. *See* Fed. R. Civ. P. 7(a). There is no provision in the Federal Rules of Civil Procedure for motions to strike another motion or memoranda. *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 229 F.R.D. 201, 203 (D. N.M. 2005) (internal citation omitted). Nonetheless, a motion to strike matters that are not part of the pleadings may be regarded as an invitation by the movant to consider whether proffered material may properly be relied upon. *United States v. Crisp*, 190 F.R.D. 546, 550–51 (E.D. Cal. 1999) (internal citations omitted). Consequently, the Court denies Plaintiff's Motion as procedurally improper, but will consider Plaintiff's arguments in opposition to Defendants' Motion.

As to Defendants' Motion for Judicial Notice, SEC filings are judicially noticeable documents which may be considered on a motion to dismiss. *See, e.g.*, *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006). Plaintiff's main objections to the Court taking judicial notice are first that Defendants did not include an official request for judicial notice when moving to dismiss the FAC, and second that the prospectuses are not from the 2007-2008 "relevant time frame." However, Plaintiff provides no authority in support of his timeliness argument and a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Moreover, although the documents attached are from 2001 and 2002, these are dates the securities in question were issued and

consequently, the dates that the prospectuses were filed.[1]

As Defendants have provided links to the SEC's website and a declaration as to the exhibits' authenticity, the Court has the necessary information for judicial notice. Additionally, Plaintiff does not challenge the authenticity of the exhibits or their contents. Accordingly, Defendants' Motion is granted; the Court takes judicial notice of the August 20, 2001 PIMCO Municipal Income Fund Prospectus (ECF No. 54-1) and the August 16, 2002 PIMCO Municipal Income Fund II Prospectus (ECF No. 54-2) (collectively, the "Prospectuses").

### C. Motion to Dismiss

Moving, then, to the Motion to Dismiss, Defendants argue that the FAC fails to allege facts sufficient to meet the heightened pleading standard under the PSLRA. Specifically, Defendants argue the FAC fails to set forth actionable false statements, fails to allege scienter with particularity, fails to plead reliance or loss causation, and fails to allege sufficient facts to establish control person liability.

### i. Legal Standard

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A properly pled complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986). In assessing the sufficiency of a complaint, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[1] The Securities in question were closed-end funds. There were no subsequent offerings that would require the filing of a new prospectus.

679 (2009). The court must then consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* When the claims in a complaint have not crossed the line from conceivable to plausible, plaintiff's complaint must be dismissed. *Twombly*, 550 U.S. at 570.

Additionally, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This rule requires that claims of fraud be accompanied by the "who, what, when, where, and how" of the conduct charged, *Vess v. Ciba-Geigy Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (*quoting Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997)), so that the complaint may not simply "lump multiple defendants together." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011). This requirement ensures that the defendants are on "notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Vess*, 317 F.3d at 1106 (internal quotations omitted).

Finally, in private actions for violations of section 10(b) and Rule 10b-5, plaintiffs must meet the additionally heightened pleading standard of the PSLRA. *Zucco Partners LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). The PSLRA requires that "a complaint plead with particularity both falsity and scienter." *Id.* (internal quotations omitted). Where the alleged fraud is based on material misstatements or omissions, falsity is plead with particularity by "specify[ing] each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief . . . stat[ing] with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Similarly, scienter is plead with particularity only where the complaint "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). If the complaint's allegations are insufficient to adequately state a claim under the heightened pleading standard, the court should grant leave to amend "unless it is clear that the complaint could not be saved by

1  amendment." *Zucco Partners*, 552 F.3d at 989 (quoting *Livid Holdings, Ltd. v. Solomon Smith*
2  *Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005)).

### ii. Analysis

Plaintiff alleges Defendants' representations that ARS were a liquid investment were materially misleading given that those representations omitted material information about the facts underlying ARS perceived liquidity.  Plaintiff further alleges that he relied on these representations in purchasing $6,900,000.00 of ARS between February 8, 2008 and the wide-spread ARS market failure on February 13, 2008.  Plaintiff states that he would not have made such investments if Defendants' omissions had been disclosed.  Finally, Plaintiff alleges that due to the loss in liquidity of the ARS purchased, those securities lost value.

Section 10(b) of the Exchange Act and its corresponding Rule 10b-5 prohibit the use of fraud or deceit in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  The elements of a 10b-5 claim are: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Defendants assert that Plaintiff's complaint does not allege sufficient facts to meet the heightened pleading standard required to state a claim for securities fraud under Section 10(b) and Rule 10b-5 or under Section 20(a). Specifically, Defendants assert that the FAC's allegations do not articulate statements or omissions that were false when made, do not give rise to a strong inference of scienter, do not state reliance, and do not plead loss causation. Additionally, Defendants argue that the FAC does not state a Section 20(a) claim because it fails to establish a primary 10b-5 violation and fails to allege specific, non-conclusory facts.

#### a. False or Misleading Statements or Omissions

Plaintiff identifies two categories of misleading statements in the FAC. First, Plaintiff states that he received account statements from Oppenheimer every month from May 2007 to

February 2008 that labeled his ARS holdings as "Cash Equivalents."[2] Second, Plaintiff alleges that Weinberg told him on several occasions via telephone that ARS were safe, same as cash, better than treasuries, and were accessible like cash. Plaintiff alleges that these statements were misleading not because ARS were illiquid at the time the statements were made, but rather because the statements failed to supply material information relating to how the liquidity of ARS was derived. Plaintiff alleges that he was not informed that the underlying asset of an ARS was a long-term bond, the buying and selling of ARS involved auctions, a successful auction was required to sell ARS, auctions could fail, underwriters placed support bids to prevent auction failures, and what rate of return the asset would produce in the event of a failed auction. Plaintiff further alleges that in making the aforementioned statements, Defendants did not disclose their own concerns about ARS liquidity, that ARS market failures were beginning to occur, and that underwriters were running out of capacity to make supporting bids.

Defendants argue the identified statements are too vague to qualify as material misstatements and cannot support a Section 10(b) claim. The Court does not agree. The account statements and Weinberg's statements generally represented that Plaintiff's investment was liquid.  Plaintiff expressly stated his desire for a liquid investment, as well as his need for liquidity, at the time of purchase.  Under these circumstances, representations of liquidity would be "significant to a the trading decision of a reasonable investor" and are consequently material. *See Basic v. Levinson*, 485 U.S. 224, 234 (1988).  Moreover, the statements omitted any information about the risks of that liquidity both due to the general structure of the security and current market conditions.  Thus, the statements were misleading, and may properly support a

---

[2] Defendants argue that several courts have held that categorizing ARS as "Cash Equivalents" on monthly account statements is not an actionable misstatement for purposes of securities fraud. However, the actual holdings in the list of cases Defendants cite, although ultimately granting motions to dismiss, hinge on the insufficiency of some other element of the Section 10(b) claim—lack of scienter, adequate disclosures, or no reliance. *See, e.g.*, *In re Merrill Lynch ARS Litig.*, No. 09 MD 2030, 2012 WL 523553 (S.D. N.Y. Feb 15, 2012). Consequently, these cases do not stand for the proposition for which Defendants cite them.

Section 10(b) claim.

However, Plaintiff's allegations that Defendants' statements violated Section 10(b) due to their omission of general information about what ARS were and how ARS markets operated are insufficient. An omission that makes a statement misleading is only material if a reasonable investor would consider its disclosure to have significantly altered the "total mix" of information available. *Id.* at 231 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1983)). Thus, the failure of a financial advisor to educate an investor on the most fundamental aspects of the investment is not a material omission. Such basic information about what a security is, how it operates, and how it is traded is widely available and within the "total mix" of information available. A reasonable investor would have at least a general concept of what he or she is purchasing.[3] Indeed, it seems oppressive to impose liability for Weinberg's failure to explain that "*auction* rate securities" involve an auction. Moreover, the general risks of auction failure and the interest rate applicable after an auction failure were set out in the Prospectuses, which were publicly available and also within the "total mix" of information available to investors. *See La Pietra v. RREEF America, L.L.C.*, 738 F. Supp. 2d 432, 441 (S.D.N.Y. 2010) (holding the contents of a security's prospectus are within the total mix of information reasonably available to investors).[4]

Nonetheless, Plaintiff's falsity allegations concerning Defendant's omissions of the necessity of underwriters support bids, the initiation of market failures, and the unsustainability

---

[3] Citing *Bridge v. E*Trade Securities*, No. C-11-2521 EMC, 2011 WL 5444266 (N.D. Cal. Nov. 9, 2011), Plaintiff argues that under Nevada Law, he was under no duty to investigate Defendants' statements. However, in *Bridge* the plaintiff only brought various state law fraud and contract claims. *Id.* at *2. *Bridge* was not an action under section 10(b) and is inapplicable here. Under federal securities law, an investor is not required to undertake extensive research, but is presumed to know that which a reasonable investor would know.

[4] Plaintiff also alleges that he never received the Prospectuses from Oppenheimer when purchasing the securities. However, delivery of a prospectus is governed by other sections of the securities statutes and corresponding regulations under which Plaintiff brings no claim. Additionally, even if Oppenheimer did not deliver a hard copy of the prospectus to Plaintiff, in today's world, documents filed with the SEC and accessible through the agency's website are readily available to investors. *See La Pietra*, 738 F. Supp. 2d at 441.

Case 2:11-cv-02078-GMN-PAL   Document 73   Filed 03/31/14   Page 11 of 19

of support bids in the face of the then-current market conditions are actionable. Plaintiff alleges that these facts were not readily accessible to investors and generally only known to Oppenheimer and the underwriters themselves. Additionally, the Prospectuses do not disclose these specific risks. Consequently, failure to disclose this information, especially as the information available to Oppenheimer increasingly suggested a heightened probability of market failure, was a material omission that rendered statements that ARS were a liquid investment misleading. Plaintiff's allegations of falsity premised on these omissions are adequate for a Section 10(b) claim.

*b. Scienter*

Plaintiff alleges that Defendants acted with scienter because, at the time the disclosure were made, Oppenheimer executives knew that the ARS markets would fail or at least acted with deliberate disregard to the risk that ARS markets would fail. Plaintiff asserts that this knowledge or recklessness is evidenced by internal emails recognizing the risk of market failure and its consequences, knowledge that some auctions had failed when underwriters refused to place support bids, access to non-public information about underwriters' actual and maximum ARS inventories, and executives' sale of personal ARS holdings.

The PSLRA requires that a securities fraud complaint state particular facts that show the defendant acted with scienter. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005). In the securities fraud context, scienter is the defendant's intention to deceive, manipulate, or defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007). Scienter is shown through the defendant's knowing or intentional conduct. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999) (superseded by statute on other grounds). Reckless behavior can also sufficiently show scienter so long as the recklessness encompasses a consciousness or deliberateness, not merely a high degree of negligence. *Id.* at 976-77.

In determining the sufficiency of a plaintiff's scienter allegation, a court must consider

"whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets the standards." *Id*. at 322-23. However, courts must also consider "plausible opposing inferences" from the facts alleged, not just those favoring plaintiff. *Id.* at 323. This is not to say a plaintiff must plead a "smoking gun" or even the most plausible of competing inferences, *Tellabs*, 551 U.S. at 324 (internal quotations removed), rather, "[a] plaintiff . . . must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Id*.

### 1. Weinberg's Scienter

Initially, the Court notes that the FAC does not allege scienter on the part of Weinberg. All of the allegations that Defendants knew of the impending demise of the ARS markets focus on Oppenheimer executives. There are no allegations that Weinberg was privy to any of the emails, inventory facts, failed auctions, or that Weinberg sold any personal ARS holdings. In fact, Plaintiff alleges that Weinberg "lacked even a rudimentary understanding about ARS and how the ARS market functioned during the relevant period." Consequently, the FAC's allegation does not demonstrate Weinberg acted with the requisite intent to deceive; they actually demonstrate quite the opposite. Accordingly, Plaintiff cannot state a claim against Weinberg individually. Moreover, based on the present allegations, Plaintiff cannot plead additional, consistent facts to cure the FAC's insufficient allegations of Weinberg's scienter, and the claims against Weinberg individually must be dismissed with prejudice.

Defendants argue that because Weinberg lacked individual scienter, the company's liability for Weinberg's statements is cut off. Generally, a plaintiff must "plead scienter with respect to [the] individual[ ] who actually made the false statement." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008). Thus, to establish fraud on the part of a corporation, it is insufficient to show a corporate officer made a statement, which another officer knew to be false. *In re Apple Computer, Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal.

2002).[5]  However, it is also well established that "the maker of a statement is the person or entity with ultimate authority over the statement." *Janus Capital Group, Inc., v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011). Thus, statements of low-level employees can be imputed to executives who exercise authority over their non-casual statements "with the intent and reasonable expectation that such statement would be relayed to the investing public." *SEC v. Daifotis*, 874 F. Supp. 2d 870, 881 (N.D. Cal. 2012).

Here, although Weinberg made the statements without scienter, Plaintiff has alleged Oppenheimer management trained its financial advisors to market ARS as liquid investments (ECF 42, ¶ 128) and provided incentives for their doing so (*id.* at ¶ 92).  Plaintiff has further alleged that Weinberg sold Plaintiff ARS pursuant to management directives. (*Id.* at ¶ 129.) Thus, Weinberg's statements can be imputed to Oppenheimer as its management had an intent and reasonable expectation that its training and directives concerning ARS would be communicated by its financial advisors to the investing public.  Moreover, the fact that Oppenheimer chose to withhold information about auction failures from its financial advisors also shows that the corporation had a reasonable expectation that its training and directives would be communicated without any caveat about its concerns based on the then-present market conditions.

### 2. Oppenheimer's scienter

Thus, Oppenheimer can be held liable for both Weinberg's statements and the statements in Plaintiff's monthly account statements provided it acted with scienter.  A corporation has the requisite scienter when someone whose intent can be imputed to the corporation acts with the requisite scienter. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531

---

[5] The Ninth Circuit has left open the question of whether "collective scienter," stands as an exception to this general rule. *Glazer*, 549 F.3d at 744.  However, it did limit collective scienter to situations where the false statements "were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Id.* However, the Court is not presented with such facts here.

F.3d 190, 195 (2d Cir. 2008). Thus, allegations of corporate executives knowing or reckless behavior is sufficient to allege scienter on the part of the corporation.

Plaintiff's allegations of executive scienter consists of allegations that the executives recognized the necessity of underwriter support bids to maintain a market and discussed the ramifications of market failure, possessed inside knowledge of underwriter's increasing ARS inventory and limited capacity, tracked instances of ARS auction failures, withheld information from financial advisors, and sold personal ARS holdings before the market collapse.[6]

Defendants argue that these allegations are insufficient to create a strong inference of scienter and systematically identify court holdings determining each of the allegations insufficient to show scienter.  However, although the Court agrees that, in isolation, Plaintiff's allegations are problematic, when viewed collectively, the amount of circumstantial evidence is sufficient to generate substantial suspicion. First, although Plaintiff fails to specify what non-public information Oppenheimer had, where it came from, or what exactly it indicated, Plaintiff's allegations do show the Oppenheimer executives were concerned about the future of a viable ARS market.  Second, Plaintiff alleges an Oppenheimer executive gave specific direction to not provide any information regarding auction failures to the company's financial advisors, who were then-presently selling ARS to investors.  Finally, Plaintiff alleges that in the two weeks before the market collapse, Oppenheimer executives were selling large quantities of their personal ARS holdings.

Thus, although the Court agrees with Defendant that a concern about the market conditions is not knowledge of the market's future demise, and allegations of executive trading

---

[6] Plaintiff also argues that the fact that the $6,900,000.00 of ARS Weinberg purchased in his account was the largest ARS transaction in such a short time frame in the history of his account also indicates the requisite scienter.  However, as discussed above, Plaintiff does not allege facts showing that Weinberg had scienter and the FAC similarly lacks any allegation that the executives, acting on inside information, instructed Weinberg to make larger purchases for Plaintiff.  Thus, without a connection between the executives and Plaintiff's purchase, it is unreasonable to infer scienter from the transaction.

are incomplete without a more complete picture of trading history, when viewed collectively, the FAC's allegations undercut a competing inference that the market collapse caught Oppenheimer by surprise. Indeed, the allegations imply that Oppenheimer's executives were prepared, or at least were preparing, for market disruption.  And, while those executives may not have known an exact date, Plaintiff's allegations imply that they at least saw writing on the wall and knew it was time to get out. Although certainly not a "smoking gun," the Court finds the inference that Oppenheimer executives were cognizant of an impending market collapse at least as likely as the inference that they were caught by surprise.  Consequently, Plaintiff has adequately alleged scienter.[7]

### c. In Connection with the purchase or sale of a security

For any statement to be actionable, it must be made in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b).  Contrarily, foregoing a purchase or holding a security in reliance on a false or misleading statement is not actionable. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754-55 (1975).

Plaintiff only specifically alleges one transaction where he purchased ARS.  Thus, although Plaintiff references an initial purchase, and vaguely refers to additional purchasers, Plaintiff has not alleged that any purchase other than the February 2008 purchase was made in reliance on the false or misleading statements. Thus, only the $6,900,000.00 February 2008 purchase is actionable.

### d. Reliance

To adequately plead the reliance prong, a plaintiff must allege that the misstatements

---

[7] Although the allegations in the FAC contain many similarities to those dismissed in *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461 (6th Cir. 2011) and *Vining v. Oppenheimer Holdings, Inc.*, No. 08 Civ. 4435(LAP), 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010), the allegations that Oppenheimer executives withheld information from financial advisors while selling their personal holdings makes the case more similar to *Dow Corning Corp. v. BB&T Corp.*, No. 09-5637, 2010 WL 4860354 (D. N.J. Nov. 23, 2010) in which the allegations were found to sufficiently allege scienter.

caused the plaintiff to engage in the securities transaction. *In re Daou Sys.*, 411 F.3d at 1025 (citing *The Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999)). In other words, but for the fraud, the plaintiff would not have engaged in the transaction. *Id*. However, reliance must be reasonable in light of the facts of the case. *See Allstate Life Ins., Co. v. Robert W. Baird & Co., Inc.*, 756 F. Supp. 2d 1113, 1130 (D. Ariz. 2010).

The Court finds that Plaintiff has adequately stated his reliance. The FAC details that Plaintiff instructed Weinberg that he needed a liquid investment. Further, Plaintiff alleges that he would not have made the investment had he known the liquidity risks of ARS at the time of his purchase. Plaintiff's reliance on any statements of his financial advisor made after Oppenheimer became aware of the liquidity risks in the ARS market would be reasonable given the prior dealings between the parties and the liquidity that had historically existed in the ARS market. Moreover, Plaintiff could not have discovered the non-public information allegedly available to Oppenheimer with minimal diligence. *See Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 (2d Cir. 2005). In other words, Plaintiff had no reason to doubt the veracity of Defendants' representations in late 2007 and early 2008. Consequently, the reliance element is satisfied.

### e. Loss Causation

Defendants additionally argue that Plaintiff has not properly pled loss causation because the claim only alleges loss due to the collapse of the ARS market, not the Defendants' misstatements. (ECF No. 18.) To demonstrate loss causation, a plaintiff must allege a causal connection between the misrepresentation and the alleged loss. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (2005). Defendants argue that because the market collapse and resulting illiquidity was the actual cause of Plaintiff's harm, the FAC insufficiently pleads loss causation because Plaintiff fails to allege that Defendants' statements to Plaintiff caused the market to collapse.

However, courts have held that loss causation is adequately pled when a securities dealer

makes a misstatement or omission, and the investor-plaintiff's harm was caused by the subject of the misstatement or the omission. *See Ah Moo v. A.G. Becker Paribas, Inc.*, 857 F.2d 615, 622 (9th Cir. 1988) (citing *Marbury Mgmt., Inc. v. Kohn*, 470 F. Supp. 509, 514 (S.D.N.Y.1979), *aff'd in part, rev'd in part*, 629 F.2d 705 (2d Cir. 2001)). Under this approach, the requisite causal connection is established by showing a defendant's misstatements or omissions "induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97-98 (2d Cir. 2001) (relying on *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980)). Where market events relating to the defendant's misstatements or omissions then expose the true "investment quality" and corresponding decline in value of the security, the defendant caused the plaintiff's loss. *See id.*[8] Thus, even though an external event may be the actual cause of loss, where that loss was a foreseeable consequence of an investor's reliance on a securities broker's false or misleading recommendation, liability may be found. *See Marbury Mgmt.*, 629 F.2d at 708.

Accordingly, Plaintiff has adequately pled loss causation. Plaintiff's allegations demonstrate that Defendants failure to disclose the mounting liquidity risks in the ARS market falsely represented the "investment quality" of ARS such that the price at which Plaintiff purchased the ARS did not reflect the ARS true "investment quality." When those undisclosed liquidity risks materialized, the true investment quality of ARS was revealed, and Plaintiff's holdings lost value. Moreover, this loss was a foreseeable consequence of Plaintiff's reliance on Defendants' recommendation of ARS given the information Defendants allegedly had about the collapsing market. Thus, even though Defendants' omissions of the liquidity risks in the ARS market did not cause the market to collapse, the omissions still caused Plaintiff's loss.

---

[8] The court in *Suez Equity* also noted that the Seventh Circuit follows a more expansive approach, simply requiring a plaintiff to allege "the very facts about which the defendant lied . . . caused [plaintiff's] injuries." *Id.* at 98 n.1 (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)).

Consequently, Plaintiff's allegations adequately plead loss causation.

Accordingly, the FAC adequately states a claim under Section 10(b) within the ramifications articulated by the Court.

### f. Control Person Liability

Plaintiff also pleads that Defendants Oppenheimer Holdings Inc. and Oppenheimer Asset Management, Inc. (the "Parent Entities") are liable as control persons of Oppenheimer under Section 20(a) of the Exchange Act. Having determined the FAC states a claim under Section 10(b), Defendants argument that Plaintiff's Section 20(a) claim fails due to no primary violation must be rejected. However, Defendant also argues that the FAC lacks specific, factual allegations sufficient to establish Section 20(a).

To establish a prima facie case under Section 20(a) of the Exchange Act, a plaintiff must show "(1) a primary violation of federal securities laws . . . and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "'Control' is defined in the regulations as 'the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person . . ..'" *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (quoting 17 C.F.R. § 230.405).

"Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir.1994) (internal quotation marks and citations omitted). "In order to make out a prima facie case, it is not necessary to show actual participation or the exercise of power . . .." *Howard*, 228 F.3d at 1065. Nonetheless, a complaint must still include factual allegations supporting that the defendant was either involved in the day-to-day business of the primary violator or connected to the fraudulent act in some way. *See Paracor Finance, Inc. v. General Elec. Capital*

*Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996); *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 736802 at *15 (C.D. Cal. Mar. 18, 2009).

Plaintiff's generalized allegations are insufficient to state a claim for control person liability. The FAC simply states that, "by virtue of [their] operational and management control" and 100% stock ownership of Oppenheimer, the Parent Entities had power to influence and did influence the decision making and actions of Oppenheimer. However, there are no specific factual allegations indicating how this control was manifested. These allegations are conclusory and not entitled to a presumption of truth. Thus, the FAC fails to state a plausible claim for control person liability and the Motion to Dismiss this claim is granted. However, as Plaintiff can add allegations consistent with the FAC that would cure the deficiency, this claim is dismissed without prejudice.

### IV.   CONCLUSION

**IT IS HEREBY ORDERED** that Defendants Oppenheimer & Co., Inc., Oppenheimer Holdings Inc., Oppenheimer Asset Management, Inc., and Mark Weinberg's Motion to Dismiss (ECF No. 54) is **GRANTED in part** and **DENIED in part**. All claims against Mark Weinberg individually are **DISMISSED with prejudice**. Additionally, Plaintiff's claims arising under Section 20(a) are **DISMISSED without prejudice**. As to the remaining claims against Oppenheimer, the Motion is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff William A. Richardson's Motion for Leave to File Excess Pages (ECF No. 55) is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Plaintiff William A. Richardson's Motion to Strike (ECF No. 58) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Judicial Notice (ECF No. 70) is **GRANTED**.

**DATED** this 31st day of March, 2014.   _____

Gloria M. Navarro, Chief Judge
United States District Court