# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| WILLIAM A. RICHARDSON,            )<br>                                                           )<br>                      Plaintiff,       )<br>      vs.                                             )<br>                                                           )<br>OPPENHEIMER & CO. INC.;           )<br>OPPENHEIMER HOLDINGS INC.;   )<br>OPPENHEIMER ASSET MANAGEMENT, )<br>INC.; and MARK WEINBERG; DOE   )<br>DEFENDANTS 1-100; ROE CORPORATE )<br>DEFENDANTS 1-100, inclusive,         )<br>                                                           )<br>                      Defendants.    )<br>                                                           ) | Case No.: 2:11-cv-02078-GMN-PAL<br><br>**ORDER** |

Pending before the Court is the Motion for Limited Reconsideration (ECF No. 74) filed by Plaintiff William A. Richardson ("Plaintiff"). Defendants Oppenheimer & Co. Inc., Oppenheimer Holdings Inc., and Oppenheimer Asset Management, Inc. filed a Response (ECF No. 77), and Plaintiff filed a Reply (ECF No. 79). For the reasons discussed below, the Motion for Limited Reconsideration (ECF No. 74) is **GRANTED**.

## I.     BACKGROUND

This is a securities fraud case arising out of the systematic failure of the Auction Rate Securities ("ARS") market in February 2008. ARS are long-term bonds and preferred stock with interest rates or dividend yields that are reset through periodic auctions. (ECF No. 43, ¶ 2). These periodic auctions provide high liquidity for the securities by enabling investors to easily sell their ARS holdings at regular intervals. (*Id.*). During an auction, potential purchasers bid by stating the minimum interest rate at which they are willing to purchase a quantity of ARS. (*Id.* at ¶ 33). The bids are then sorted, high to low, and the lowest interest rate required to sell

all available ARS—the "clearing rate"—becomes the rate that applies until the next auction. (*Id.*).  Alternatively, if there are an insufficient number of bids to cover all the ARS offered for sale, the auction fails and the investors must retain their ARS until the next auction. (*Id.*).

Because of these periodic auctions, ARS were generally regarded as having the same liquidity as a money market fund but offering higher returns. (*Id.* at ¶ 2).  However, for many years, the success of the auctions was allegedly dependent on ARS underwriters purchasing large quantities of ARS at each auction to ensure that the auction did not fail (support bids), thus preserving the perceived liquidity of the security. (*Id.* at ¶ 17).  Beginning in 2007, the ARS underwriters allegedly began to withdraw their support bids and a few auctions—roughly 2-6%—began to fail. (*Id.* at ¶ 47).  This modest withdrawal of support, eventually culminated in a market-wide failure on February 13, 2008, when 87% of auctions failed. (*Id.* at ¶ 48).

As early as 2002, Plaintiff William A. Richardson ("Plaintiff") began to invest in ARS on the advice of his financial advisor, Defendant Mark W. Weinberg ("Weinberg"), an employee of Defendant Oppenheimer & Co. Inc. ("Oppenheimer"). (*Id.* at ¶ 4).  Plaintiff informed Weinberg that he needed to have immediate access to his funds at all times and was consequently looking for a very liquid investment. (*Id.* at ¶ 5).  Presumably at this time, Weinberg informed Plaintiff about ARS and allegedly represented to Plaintiff that ARS were as liquid and secure as cash, were better than a certificate of deposit or money market account, and that Plaintiff would be able to access his funds when needed. (*Id.*).  Plaintiff alleges that Weinberg continued to make similar representations on telephone calls with Plaintiff from January 29, 2007 through January 31. (*Id.* at ¶ 41a-yy).  Additionally, during this time-span, Oppenheimer sent monthly account statements to Plaintiff that listed his ARS holdings under the category "Cash Equivalents" (*Id.* at ¶ 41a-m).  Relying on these statements, Plaintiff authorized Weinberg to purchase $6,900,000.00 worth of ARS in the early part of February 2008.

At the time these statements were made, Plaintiff alleges Oppenheimer knew of, or acted with deliberate indifference toward, the market's impending demise. (*Id.* at ¶ 186). Plaintiff alleges that Oppenheimer executives sent internal emails recognizing the market's reliance on underwriters' support bids and discussing what would happen in the event of a market failure. (*Id.* at ¶ 50). Plaintiff also alleges that Oppenheimer executives tracked the inventory capacity and current holdings of underwriters using a computerized spreadsheet (*id.* at ¶ 107, 109) and monitored the auction failures happening across the market (*id.* at ¶ 116). Oppenheimer executives allegedly made an affirmative decision to not inform Oppenheimer's financial advisors of the concerning trends developing in the ARS market. (*Id.* at ¶ 62). At the same time, Oppenheimer executives sold personal holdings of ARS in the days immediately preceding the market collapse. (*Id.* at ¶¶ 51-57).

On February 14, 2008, after the market-wide failure, Weinberg allegedly called Plaintiff and informed him his ARS holdings were frozen. (*Id.* at ¶ 41zz). Additionally, Plaintiff's March 2008 account statement listed his ARS holdings under the category "Other Securities." (*Id.* at ¶ 41n). Plaintiff alleges that his ARS holdings lost significant value because of the illiquidity resulting from the market collapse. (*Id.* at ¶ 159).

Plaintiff filed this lawsuit against Defendants alleging violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), ("Section 10(b)") and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, ("Rule 10b-5"). Plaintiff also alleges that Defendants Oppenheimer Holdings Inc. and Oppenheimer Asset Management, Inc. are liable for Oppenheimer's Actions as control persons under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"). The Court granted Defendants' first Motion to Dismiss because Plaintiff had not pled false statements with sufficient particularity to meet the heightened pleadings standards of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b). (ECF No. 40). Plaintiff filed his First Amended Complaint (the "FAC")

on June 20, 2013, and Defendants again collectively moved to dismiss, arguing that the FAC also fails to plead facts with sufficient particularity to satisfy the heightened pleading standard under the PSLRA.

Regarding Defendants' second Motion to Dismiss, the Court dismissed with prejudice all claims against Weinberg. (Order Mot. to Dismiss 19:15–16, ECF No. 73).  Additionally, Plaintiff's claims arising under Section 20(a) were dismissed without prejudice. (*Id.* 19:16–17). Finally, the Motion to Dismiss was denied as to the remaining claims against Oppenheimer. (*Id.* 19:17–18).  Shortly thereafter, Plaintiff filed the instant Motion for Limited Reconsideration. (ECF No. 74).

## II.   **LEGAL STANDARD**

Under Rule 60(a) a Court may correct any clerical mistakes based on its own oversight or omissions.  Additionally, under Rule 60(b), a court may relieve a party from a final judgment, order or proceeding only in the following circumstances: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) any other reason justifying relief from the judgment. *Backlund v. Barnhart*, 778 F.2d 1386, 1387 (9th Cir. 1985).  "Relief under Rule 60(b)(6) must be requested within a reasonable time, and is available only under extraordinary circumstances." *Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981) (internal citations omitted).

A motion for reconsideration must set forth the following: (1) some valid reason why the court should revisit its prior order; and (2) facts or law of a "strongly convincing nature" in support of reversing the prior decision. *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003).  However, a motion for reconsideration is not a mechanism for rearguing issues presented in the original filings, *Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985), or "advancing theories of the case that could have been presented earlier, *Resolution Trust Corp.*

*v. Holmes*, 846 F. Supp. 1310, 1316 (S.D. Tex. 1994) (footnotes omitted).  Thus, Rule 59(e) and 60(b) and are not "intended to give an unhappy litigant one additional chance to sway the judge."  *Durkin v. Taylor*, 444 F. Supp. 879, 889 (E.D. Va. 1977).

## III. DISCUSSION

Plaintiff urges the Court to reconsider the following finding regarding statements and omissions being made in connection with the purchase or sale of a security:

> Plaintiff only specifically alleges one transaction where he purchased ARS. Thus, although Plaintiff references an initial purchase, and vaguely refers to additional purchases, Plaintiff has not alleged that any purchase other than the February 2008 purchase was made in reliance on the false or misleading statements. Thus, only the $6,900,000 February 2008 purchase is actionable.

(Order Mot. to Dismiss 15:15–19, ECF No. 73).  Plaintiff asserts that "this finding is inconsistent with the other findings issued by the Court in both the May 10, 2013, Order and the March 31, 2014, Order …." (Pl.'s Mot. for Limited Recons. 3:22–23, ECF No. 74).  Moreover, Plaintiff asserts that he "did in fact plead that all of the purchases from January 2007 forward were made in reliance upon the misstatements and omissions," and "all of the purchases referenced in the Complaint should be actionable and Plaintiff should not be limited in his pursuit of Oppenheimer on his 10b claims." (*Id.* 3:24–28).

On the other hand, Defendants assert that, "[w]hile Richardson does identify multiple alleged ARS purchases in footnote 4 of the Amended Complaint, all of them occurred on or before November 28, 2007 except for the $6.9 million he allegedly purchased in February 2008, which the Court concluded were the only purchases that could potentially support a claim." (Defs.' Response 2:2–6, ECF No. 77).

Section 10(b) of the Exchange Act and its corresponding Rule 10b-5 prohibit the use of fraud or deceit in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  The elements of a 10b-5 claim are: (1) a material misrepresentation or

omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

In its March 31, 2014 Order, the Court found two categories of alleged misrepresentations potentially actionable: (1) the account statements Plaintiff received from Oppenheimer, and (2) the alleged telephone calls from Weinberg. (Order Mot. to Dismiss 8:24–9:3). According to Plaintiff's First Amended Complaint, Plaintiff received account statements from Oppenheimer as earlier as February 1, 2007, and received telephone calls from Weinberg as early as January 29, 2007. (*See* Pl.'s First Am. Compl. ¶¶ 41(a)–(zz), ECF No. 43). Thus, the earliest misleading or false statement plead with particularity that could have been made in connection with the purchase or sale of a security is January 29, 2007, the date of the first alleged phone call from Weinberg.

In footnote 4 of his First Amended Complaint, Plaintiff specifically alleges 19 individual purchases of ARS. (*Id.* ¶ 13, n. 4). Two of these purchases occurred before January 29, 2007, and therefore, are not actionable. However, the remaining 17 purchases include:

- Pimco Municipal Fd Wed $400,000 purchased on July 18, 2007;
- Pimco Municipal Fd Tue $425,000 purchased February 12, 2008;
- Pimco Municipal Fd Thu $425,000 purchased June 28, 2007;
- Pimco Municipal Fd II Tue $575,000 purchased May 1, 2007;
- Pimco Municipal Fd II Fri $575,000 purchased August 10, 2007;
- Pimco Municipal Fd II Thu $600,000 purchased July 12, 2007;
- Pimco Municipal Fd II Wed $625,000 purchased November 28, 2007;
- Pimco Municipal Fd II Wed $650,000 purchased September 26, 2007;
- Pimco Municipal Fd II Tue $1,000,000 purchased June 26, 2007;
- Pimco Municipal Fd II Wed $1,100,000 purchased October 3, 2007;
- Pimco Municipal Fd II Mon $1,600,000 purchased October 5, 2007;

- Pimco Municipal Fd Mon $1,675,000 purchased February 11, 2008;
- Pimco Municipal Fd II Fri $1,750,000 purchased September 28, 2007;
- Pimco Municipal Fd II Thu $2,000,000 purchased September 27, 2007;
- Pimco Municipal Fd Wed $2,000,000 purchased October 3, 2007;
- Pimco Municipal Fd Thu $2,000,000 purchased September 27, 2007; and
- Pimco Municipal Fd II Tue $325,000 purchases April 10, 2007.

(*Id.*).  These purchases total $17,725,000.  Additionally, Plaintiff alleges that he purchased $6,900,000 of ARS in February 2008. (*Id.* ¶ 14).  However, $2,100,000 of the February 2008 purchases is also alleged in the purchases included in footnote 4.  Thus, the purchases listed above and the additional $4,800,000 of February 2008 purchases are actionable, totaling $22,525,000 of actionable purchases.

## IV.     CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Limited Reconsideration (ECF No. 74) is **GRANTED**.

**DATED** this 8th day of January, 2015.

_____
Gloria M. Navarro, Chief Judge
United States District Judge